UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSEPH N. BROYLES

   v.

CANTOR FITZGERALD & CO., *ET AL.*

CIVIL ACTION NO.: 3:10-854-JJB-SCR

**Consolidated with:**

JOSEPH N. BROYLES, *ET AL.*, AS REPRESENTATIVES OF CA HIGH YIELD FUND, LLC; CA HIGH YIELD OFFSHORE FUND, LTD.; CA CORE FIXED INCOME FUND, LLC; CA CORE FIXED INCOME OFFSHORE FUND, LTD.; CA STRATEGIC EQUITY FUND, LLC; AND CA STRATEGIC EQUITY OFFSHORE FUND, LTD.

   v.

CANTOR FITZGERALD & CO., *ET AL.*

CIVIL ACTION NO.: 3:10-857-JJB-SCR

THIS PLEADING APPLIES TO CIVIL ACTION NO. 3:10-854.

## FIRST AMENDED AND RESTATED COMPLAINT

NOW COME plaintiffs, Joseph N. Broyles, domiciled in the parish of East Baton Rouge, State of Louisiana; M. Badi Asbahi, domiciled in the parish of Livingston, State of Louisiana; Preston Cloyd, domiciled in the parish of Lafayette, State of Louisiana; Steve Collins and Eileen Collins, husband and wife, domiciled in the parish of East Baton Rouge, State of Louisiana; Charles and Anne Richey, husband and wife, domiciled in the Parish of Sabine, State of Louisiana; Susan B. Beninati, domiciled in the Parish of Orleans, State of Louisiana; Russ P. Barranco, domiciled in the Parish of Orleans, State of Louisiana; Janice B. Virgadamo, domiciled in the Parish of Jefferson, State of Louisiana; Jody A. Barranco, domiciled in the Parish of Jefferson, State of Louisiana; Karen L. Barranco, domiciled in the County of Los Angeles, State of California; Louisiana the Municipal Employee's Retirement System of Louisiana, domiciled in the parish of East Baton Rouge, State of Louisiana; and the Registrar of Voters Employee Retirement System, domiciled in the parish of East Baton Rouge, State of Louisiana ("plaintiffs"), who respectfully amend and restate the petition for damages initially brought by Joseph N. Broyles in Louisiana State Court and thereafter removed to this Court as follows:

### PREFATORY STATEMENT

1.

The present suit is brought exclusively under state law and asserts only the claims of the plaintiffs specifically named in this amended complaint. The plaintiffs do not assert any claims based on federal law, and no claims are made on behalf of other unnamed persons or any class thereof.

**OVERVIEW**

2.

The present suit arises out of the defendants' creation, structuring, management, offering, placement, sale, and/or valuation of, as well as other transactions relating to, Collybus CDO I Ltd. and/or Collybus CDO I Corp. ("Collybus"), a collateralized debt obligation ("CDO") issued at a face value of approximately $1.012 billion (U.S.), as well as the defendants' tortious acts surrounding the sale of securities, self-dealing by and between the defendants, breach of contract, breach of fiduciary duty, mismanagement of the plaintiffs' assets, conversion of the plaintiffs' assets, misrepresentations, misstatements and omissions of material fact made to the plaintiffs' in connection with the sale of Collybus and/or other security-related transactions, other violations of state law, and conspiracy to commit any or all of the above, any and all of which acts have caused plaintiffs to sustain millions of dollars in losses.

3.

In mid- to late-2007, when the United States housing market was in apparent distress and subprime residential mortgage-backed securities ("RMBS") – and the structured investment vehicles (such as CDOs) which held subprime RMBS – were rapidly losing value and facing illiquidity, Walter A. Morales ("Morales"), Commonwealth Advisors, Inc., acting through its officers, directors, employees and control persons, including the individual defendants named herein ("Commonwealth"), and Cantor Fitzgerald and Co. ("Cantor") together created, structured, managed, offered, placed and/or sold Collybus, a cash-flow CDO backed primarily by RMBS, including subprime RMBS and RMBS of young vintage which were anticipated to experience defaults or other adverse credit events in the near future, in order to, *inter alia*, avoid write-downs, repackage Troubled Assets, unload Troubled Assets, inflate the reported value of

Investors' portfolios, and generate substantial transaction and management fees for the parties, all without the knowledge of plaintiff.

4.

In at least two transactions, one in November of 2007 and another in June of 2008, Cantor sold a total of approximately $740,000,000 (face value) of Collybus notes to certain Commonwealth-created "pooled asset" funds controlled by Commonwealth through Morales ("the CA Funds"). The CA Funds owned by the plaintiffs are believed to have paid approximately $350 million in cash for Collybus notes that Cantor knew either were – or soon would be – illiquid. Plaintiffs sustained millions in losses through the liquidation of their assets to effectuate the Collybus transactions and pay monies purportedly owed to Cantor as a consequence of the Collybus transactions. Plaintiffs paid millions in fees related to the purchases of Collybus and the inflated values of the CA Funds reported to plaintiffs.

5.

Cantor and Commonwealth took advantage of plaintiffs' status as shareholders/members in the CA Funds, which were designed to minimize the transparency of Commonwealth's actions as manager of the funds, fund administration, and fund-related transactions such as the creation and purchase of Collybus and Commonwealth's other dealings with Cantor. Commonwealth mismanaged plaintiffs' funds, made misrepresentations of material fact, omitted material facts, and breached its fiduciary duties not only by investing plaintiff in these pooled-asset funds, but also in its actions as the fund manager holding the authority to buy and sell assets of the Commonwealth funds – such as the purchase of Collybus. Cantor withheld these and other material facts from the plaintiffs and instead communicated and contracted only with Commonwealth, and Morales in particular. Cantor knew that Morales and Commonwealth were

engaged in self-dealing, acting in their own self interests, and breaching their fiduciary duties to the plaintiffs in connection with the Collybus transactions. In addition to all other allegations contained herein, Cantor conspired with Commonwealth to commit any or all of the tortious acts committed by Commonwealth. As a direct result of the defendants' actions, plaintiffs sustained hundreds of millions of dollars in aggregate losses.

## PLAINTIFFS

6.

Named as plaintiffs are the following:

      a.      Joseph N. Broyles, an individual residing and domiciled in the State of Louisiana, Parish of East Baton Rouge;

      b.      M. Badi Asbahi, an individual residing and domiciled in the State of Louisiana, Parish of Livingston;

      c.      Preston Cloyd, an individual residing and domiciled in the State of Louisiana, Parish of Lafayette;

      d.      Steven Collins and Eileen Collins, husband and wife, residing and domiciled in the State of Louisiana, Parish of East Baton Rouge;

      e.      Charles and Anne Richey, husband and wife, residing and domiciled in the State of Louisiana, Parish of Sabine;

      f.      Susan B. Beninati, residing and domiciled in the State of Louisiana, Parish of Orleans;

      g.      Russ P. Barranco, residing and domiciled in the State of Louisiana, Parish of Orleans;

h.      Janice B. Virgadamo, residing and domiciled in the State of Louisiana, Parish of Jefferson;

i.      Jody A. Barranco, residing and domiciled in the State of Louisiana, Parish of Jefferson; and

j.      Karen L. Barranco, residing and domiciled in the State of California, County of Los Angeles.

k.      Municipal Employee's Retirement System of Louisiana ("MERS"), a statutorily-chartered government entity with the powers and privileges of a corporation, including the power to sue and be sued in its own name, and an arm of the State of Louisiana, performing a valuable and essential state function and managed by a Board of Trustees, whose members are appointed pursuant to Louisiana law and who have authorized the filing of this actions. MERS resides and is domiciled in the Parish of East Baton Rouge, State of Louisiana; and

l.      The Registrar of Voters Employee Retirement System ("ROVERS"), a statutorily-chartered government entity with the powers and privileges of a corporation, including the power to sue and be sued in its own name, and an arm of the State of Louisiana, performing a valuable and essential state function and managed by a Board of Trustees, whose members are appointed pursuant to Louisiana law and who have authorized the filing of this actions. ROVERS resides and is domiciled in the Parish of East Baton Rouge, State of Louisiana.

7.

The above named natural and juridical persons, herein collectively "plaintiffs," were at all pertinent times clients of Walter A. Morales and Commonwealth Advisors, Inc., which acted

as investment advisor to plaintiffs and owed all of the fiduciary and other duties commensurate with such a position.  Plaintiffs were, and still are, invested in one or more pooled-asset funds, created and managed by Commonwealth, which hold portions of the Collybus CDO.  Plaintiffs have suffered financial losses through their investment in any Commonwealth-managed fund, including those funds which ever owned or presently own any portion of Collybus, and/or who otherwise have suffered financial losses through the tortious actions of Commonwealth Advisors, Inc., Cantor Fitzgerald & Co., and/or the other defendants named herein. Plaintiffs bring this suit against the defendants for financial and other losses stemming from his investments with Commonwealth and/or sustained as a consequence of the tortious actions of the defendants.

**DEFENDANTS**

8.

Named as defendants are the following:

a.     Cantor Fitzgerald & Co., a New York partnership and investment bank with its principal place of business located at 110 East 59th Street, 4th Floor, New York, New York, 10022.  Cantor is subject to the jurisdiction of this Court for having caused injuries to Louisiana residents through the creation and sale of securities in Louisiana; for having joined together with one or more Louisiana residents to commit tortious acts against Louisiana residents; for having regularly conducted business with Commonwealth Advisors, Inc., a Louisiana corporation; for having derived revenue from the sales of a CDO to Louisiana residents; for having created, underwritten and sold a CDO that caused injuries to Louisiana residents, when at the time the CDO was placed into the stream of commerce, it was reasonably foreseeable that the CDO would be owned by Louisiana residents and/or funds with their principal place of business in

7

Louisiana; and for having engaged in activities directed at the State of Louisiana when it was reasonably foreseeable that Cantor could be sued in Louisiana for having engaged in such activities, all as more fully alleged herein.

b.    Commonwealth Advisors, Inc., a registered investment advisor and Louisiana corporation with its registered office located at 315 Third Street, Baton Rouge, Louisiana 70801, in the Parish of East Baton Rouge.

c.    Walter A. Morales III, an individual domiciled and residing in the State of Louisiana, Parish of East Baton Rouge, and at all pertinent times the President and Chief Investment Officer of Commonwealth Advisors, Inc.

d.    Jennifer O. Morales, an individual domiciled and residing in the State of Louisiana, Parish of East Baton Rouge, and at all pertinent times a shareholder and control person of Commonwealth Advisors, Inc.

e.    James F. O'Beirne, an individual domiciled and residing in the State of Louisiana, Parish of East Baton Rouge, and at all pertinent times the compliance officer and Vice-President of Commonwealth Advisors, Inc.

f.    Noel Caldwell, an individual domiciled and residing in the State of Louisiana, Parish of East Baton Rouge, and at all pertinent times the Corporate Secretary, Manager of Operations and a control person of Commonwealth Advisors, Inc.

g.    Willie Gerald Warrington Jr.,  an individual believed to be residing in the State of Louisiana, Parish of East Baton Rouge, and at all pertinent times the Chief Compliance Officer and Chief Operating Officer of Commonwealth Advisors, Inc.

9.

There is no diversity of citizenship between the parties. Commonwealth Advisors, Inc., Walter A. Morales III, Jennifer O. Morales, James F. O'Beirne, Noel Caldwell, and Willie Gerald Warrington Jr. are citizens of the State of Louisiana. Joseph Broyles, M. Badi Asbahi, Preston Cloyd, Steve Collins and Eileen Collins, Charles and Anne Richey, Susan B. Beninati, Russ P. Barranco, Janice B. Virgadamo, and Jody A. Barranco are citizens of the State of Louisiana. The claims asserted involve injuries to Louisiana residents and will be governed predominately, if not exclusively, by the law of the State of Louisiana.

## ALLEGATIONS APPLICABLE TO CLAIMS FOR RELIEF

10.

Although some of the transactions and actions of the defendants took place as far back as 2006, this suit is timely filed. As more fully alleged herein, Commonwealth owed fiduciary duties to the plaintiffs, which included an obligation to manage their investments with reasonable care, to inform plaintiffs of all material facts in connection with investment recommendations, and actions taken by Commonwealth and a duty to provide ongoing monitoring and prudent management. Commonwealth, acted in concert with the other defendants, breached those duties, and has continuously engaged in actions designed to inflate the value of plaintiffs' investments, lull plaintiffs into a false sense of security, as to the value and status of their investments. Also, plaintiffs' claims against Cantor Fitzgerald and Commonwealth, *in solido*, were not discovered until approximately the summer of 2010. Moreover, some of plaintiffs' allegations, though believed after reasonable inquiry to be grounded in fact, are by necessity based on reasonable inferences and assumptions made from certain facts, as the alleged acts are believed to have been elusive, complex and done without plaintiffs' knowledge. Additionally, Commonwealth has

continuously engaged in actions designed to shield its wrongdoings and Cantor's wrongdoings (such as through written correspondence from Commonwealth to the Investors and oral communications), and Commonwealth has continuously made written and oral misrepresentations concerning the value to the CA Funds and Collybus in order to lull plaintiffs into a false sense of security and to assure them that their investments are safe.   Finally, this suit is timely filed pursuant to La. C.C.P. art. 596 based upon the fact that the pending class action suspends prescription as to the plaintiffs' claims.

11.

Commonwealth Advisors, Inc., and its officers, directors, employees, control persons, and others for whom it is vicariously liable and/or with whom it is solidarily liable, including defendants Walter A. Morales III, Jennifer O. Morales, James F. O'Beirne, Noel Caldwell, and Willie Gerald Warrington, Jr., and other employees not presently named as defendants, are collectively referred to as "Commonwealth."

12.

At all times pertinent hereto, plaintiffs were clients of Commonwealth, which, acting as plaintiffs' investment advisor and certified financial advisor, invested and managed plaintiffs' investment portfolios.

### Investment in the CA Funds

13.

In 2006 and 2007, Commonwealth and Morales solicited plaintiffs to invest in one or more "pooled asset" hedge funds created and controlled by Commonwealth through Morales: CA High Yield Fund, LLC; CA High Yield Offshore Fund, Ltd.; CA Core Fixed Income Fund, LLC; CA Core Fixed Income Offshore Fund, Ltd.; CA Strategic Equity Fund, LLC; CA

Strategic Equity Offshore Fund, Ltd.; Sand Spring Capital, Ltd., and CA Sand Spring Capital III, LLC (the "CA Funds").   Thereafter, plaintiffs gave up millions in cash in exchange for membership interests and/or shares of stock in one or more of the CA Funds.

14.

At all pertinent times, Commonwealth acted both as the seller and the financial advisor to plaintiffs with regard to the sale of the CA Funds.

15.

Each of the CA Funds was supposed to have a different investment strategy and, thus, different holdings, as represented by Commonwealth and as indicated by the names of the various CA Funds, *i.*e. high yield, fixed income, equities.  In short, there was supposed to be diversification among the funds.  However, as more fully alleged herein, it has been discovered that there is no diversification between the funds.  Rather, each of the CA Funds were primarily invested in the same, illiquid asset since at least June of 2008: the A-2 tranche of Collybus. Essentially all remaining assets owned by the CA Funds have been written off by Commonwealth.  Despite the illiquidity and volatility of Collybus, Commonwealth has continuously represented that the CA Funds have retained substantial, albeit depreciated, market value by virtue of the Collybus A-2 tranche; however, in reality, Collybus has little market value, and the assets of the CA Funds are frozen due to the illiquidity of the Collybus A-2 tranche owned by each of the CA Funds.

16.

As manager of the CA Funds, Commonwealth was positioned to collect high management fees, transaction fees, performance fees and/or other fees or commissions which were based, in part or in whole, on the value of the CA Funds as shown on the plaintiffs'

investment statements.  Thus, the higher the value reflected on plaintiffs' statements, the more money Commonwealth ostensibly was permitted to collect as a fee.

17.

Upon information and belief, from 2006 through the present Commonwealth has collected millions of dollars from plaintiffs in management fees, transaction fees, performance fees and/or other fees or commissions on the CA Funds.

18.

In connection with the sales of the CA Funds to plaintiffs, Commonwealth, acting as seller of the CA Funds and as financial advisor and fiduciary to plaintiffs, misrepresented and omitted the truth, made misstatements and omissions of material fact, breached its fiduciary duties, committed tortious acts, and otherwise misrepresented, withheld, and/or failed to disclose information which, by law, Commonwealth was required to disclose to plaintiffs.

19.

The actions undertaken by Commonwealth in connection with the events giving rise to this suit were *ultra vires* and committed in breach of their fiduciary duties to the plaintiffs, for Commonwealth's benefit at the expense of the plaintiffs, without the plaintiffs' knowledge or consent, and to the detriment of the plaintiffs.  Cantor knew, or in the exercise of reasonable care, should have known this.

### The Creation of Collybus and the 2007 Sale of the C & D Tranches

20.

In 2007, the United States housing market was experiencing a significant downturn, and it quickly became apparent to Commonwealth, other hedge fund managers, and investment banks that certain RMBS, as well as CDOs, collateralized mortgage obligations ("CMOs") and credit

default swaps ("CDS") directly tied to the performance of RMBS, were or would be decreasing in value and, in some instances, were facing a liquidity crisis and were expected to become unmarketable ("Troubled Assets").

21.

At this same time, it is believed that some, but not all, of the holdings of the CA Funds were comprised of Troubled Assets. However, it is also believed that at this time, the CA Funds also held liquid, marketable assets.

22.

Upon information and belief, the value of the Troubled Assets held by the CA Funds was based on the actual, current market price of the asset. Consequently, as the Troubled Assets became increasingly harder to sell (demand decreased), their prices plummeted. Because the CA Funds owned some of these Troubled Assets, any drop in the price of the underlying assets would result in a decrease in the value of the CA Funds as reflected on the investment statements issued by the fund administrator to plaintiffs.

23.

As manager of the CA Funds, Commonwealth was positioned to collect high management fees, transaction fees, performance fees and/or other fees or commissions which were based, in part or in whole, on the value of the CA Funds as shown on the plaintiffs' investment statements. Thus, the higher the value reflected on plaintiffs' statements, the more money Commonwealth was permitted to collect as a fee. Upon information and belief, from 2006 through the present Commonwealth has collected millions of dollars in management fees, transaction fees, performance fees and/or other fees or commissions from plaintiffs.

24.

It is reasonably believed, and therefore alleged, that a substantial drop in the value of the CA Funds would have been detrimental to Commonwealth insofar as it would have soured investor confidence, damaged Commonwealth's reputation, impeded Commonwealth's ability to recruit new investors into its hedge funds, and caused a substantial decrease in the amount of fees that were able to be collected by Commonwealth.

25.

Thus, in 2007 Commonwealth began to formulate a plan to maintain and/or inflate the value of the CA Funds as reflected on plaintiffs' statements.

26.

Since the Troubled Assets held by the CA Funds presumably were worth significantly less than what the CA Funds paid for them, any actual sale of the Troubled Assets on the open market would have resulted in a loss reflected on the CA Funds' statements.  On the other hand, Commonwealth had to get the Troubled Assets off of the CA Funds' balance sheets, since keeping them also would have resulted in a substantial loss being reflected on the fund statements.  Upon information and belief, plaintiffs allege that Commonwealth's solution to this problem was to transfer the Troubled Assets for use as collateral in a new security and then buy portions of the new security, thereby creating a market for the Troubled Assets and artificial value for the CA Funds held by the plaintiffs.

27.

In particular, it is reasonably believed, and therefore alleged, that Commonwealth planned to "re-securitize," or re-package, the Troubled Assets by wrapping the assets into a newly-formed CDO to be managed by Commonwealth.  In return for transferring the Troubled

Assets for use as collateral in a newly-created CDO, the CA Funds (through Commonwealth, of course) would obtain one or more sections, or tranches, of the newly formed CDO.  While the new CDO owned by the CA Funds would in effect own the same Troubled Assets that the funds once held, the CDO would be valued much higher than the underlying Troubled Assets, in part due to the inflated sale price of the CDO tranche bought by the CA Funds, the higher rating awarded to the CDO by the ratings agencies, the pooling of the Troubled Assets with other assets, and the overall complexity in valuing CDOs and the deference afforded to CDO collateral managers in this area.

28.

In order to carry out its plan to inflate the reported value of the CA Funds, Commonwealth needed an investment bank that would be willing to underwrite the CDO and put Commonwealth in charge of selecting and managing the holdings of the CDO, a position called the "collateral manager."  This investment bank was Cantor Fitzgerald & Co.

29.

In approximately early to mid-2007, Cantor Fitzgerald & Co., joined together with Commonwealth for purposes of carrying out Commonwealth's plan; the two defendants entered into an agreement for the creation, management, underwriting, placement and/or sale of Collybus CDO I Ltd. and/or Collybus CDO I Corp., collectively referred to as Collybus.  Among other things, Cantor agreed to (1) underwrite Collybus and (2) make Commonwealth collateral manager of Collybus.

30.

Upon information and belief, in exchange for Cantor's agreement to underwrite Collybus and make Commonwealth collateral manager, Commonwealth was to (1) transfer certain assets

15

held by the CA Funds, including but not necessarily limited to the Troubled Assets, to Cantor and/or Collybus for inclusion as Collybus collateral; (2) effect the purchase of the entire Collybus C tranche, Series 2007-1A Class C Notes (CUSIP 19516PAE1) at a face value of $35,000,000; (3) effect the purchase of the entire Collybus D tranche, Series 2007-1A Class D Notes (CUSIP 19516PAF8) at a face value of $44,000,000; and (4) effect the purchase of approximately 84% of the unrated, equity tranche of the CDO (CUSIP 195161104) at a face value of nearly $51,000,000.

31.

Cantor and Commonwealth agreed that plaintiffs and other investors' assets would be used to purchase the C, D and equity tranches of Collybus.

32.

The creation, management, underwriting, placement and/or sale of Collybus in 2007, and all agreements, actions and transactions by or between Cantor and Commonwealth and their officers, directors, agents, and/or employees regarding same, are collectively referred to as "the 2007 Collybus deal."

33.

Also in furtherance of the 2007 Collybus deal, Commonwealth and Cantor entered into a master repurchase agreement in late March of 2007. It is reasonably believed, and therefore alleged, that the purpose of this master repurchase agreement was to permit Commonwealth to purchase Collybus notes and/or other assets using leverage.

34.

Commonwealth and Cantor's plan came to fruition; on or about November 9, 2007, Collybus CDO I Ltd. and Collybus CDO I Corp., an unregulated, "over the counter" cash-flow

CDO secured primarily by RMBS, was placed by Cantor for sale at a face amount of over $1,012,000,000 (one billion, twelve million dollars). According to its prospectus, the CDO was comprised of seven tranches, six classes of rated notes and a residual, unrated equity tranche, issued at the following face values: Class A-1 Notes $90,000,000 (U.S.); Class A-2 Notes $675,000,000 (U.S.); Class A-3 Notes $55,000,000 (U.S.); Class B Notes $53,000,000 (U.S.); Class C Notes $35,000,000 (U.S.); Class D Notes $44,000,000 (U.S.); Subordinate Securities (equity tranche) $60,583,157.67 (U.S.). The tranches were to be paid out in order of seniority (e.g. the entire A-1 principal and interest had to be paid in full before the A-2 tranche received any principal and interest). Thus, in the event of defaults on the assets backing the Collybus CDO (such as would occur if people began to default on their mortgages), the Collybus C, D, and equity tranches would be the last to receive any principal and interest payments, making it highly unlikely that these tranches would ever yield a return.

35.

On or near November 9, 2007, Commonwealth, ostensibly acting for one or more CA Funds and other Commonwealth-controlled funds, purchased the C and D tranches of Collybus, as well as a substantial portion of the Collybus equity notes, believed to be approximately 84% of the equity tranche.

36.

At all pertinent times during the 2007 Collybus deal, Cantor acted as the seller of the Collybus notes, or alternatively, as Collybus' selling agent, dealer and/or salesman.

37.

The total face value of the Collybus tranches purchased in the 2007 Collybus deal was approximately $130,000,000. Plaintiffs are currently not aware of precisely what total amount

was paid in cash for these assets; however, based on 2007 year-end financials, the CA High Yield Fund, LLC paid approximately $2,854,000 in cash; the CA Core Fixed Income Fund, Ltd. paid approximately $13,261,000 in cash; and the CA Core Fixed Income Fund, LLC paid approximately $35,766,000 in cash, for a total of at least $51,881,000 paid in cash by these three funds alone for interests in the Collybus C, D and/or equity tranches. Based on these figures, it is reasonably believed, and therefore alleged, that the CA Funds paid approximately $130,000,000 for interests in the Collybus C, D and/or equity tranches in the 2007 Collybus deal.

38.

Upon information and belief, Commonwealth used plaintiffs' assets and/or cash to effectuate the 2007 Collybus deal and/or to purchase the Collybus C, D and equity tranches.

39.

The Collybus C, D and equity tranches which were purchased by Commonwealth ostensibly on behalf of the CA Funds are presently worthless and are not reasonably anticipated to ever have any substantive value. The C and D tranches have been given C ratings by Moody's; the equity tranche, is not rated and never has received a rating.

40.

Upon information and belief, Cantor's participation in the 2007 Collybus deal was done in furtherance of Commonwealth's breach of its fiduciary duties to plaintiffs and its plan to create a market for the Troubled Assets and inflate the value of the assets reflected on plaintiffs' statements. For example and upon information and belief:

      a.      Cantor knew that plaintiffs and other investors would sustain financial losses because of 2007 Collybus deal and the actions of Commonwealth;

b.      Cantor knew that the CA Funds were owned by plaintiffs and other investors, not Commonwealth, and that the CA Funds, not Commonwealth, were the purchasers of the Collybus C, D, and equity tranches;

c.      Cantor knew that Commonwealth's participation in the 2007 Collybus deal was not part of a legitimate investment.  To the contrary, Cantor required Commonwealth to purchase these assets in exchange for Cantor's agreement to underwrite Collybus and make Commonwealth collateral manager;

d.      Cantor knew that as collateral manager of Collybus, Commonwealth intended to use the Troubled Assets previously held by the CA Funds as part of the Collybus collateral, thereby getting the Troubled Assets off of the CA Funds' books and artificially inflating the value of the plaintiffs' investment statements in the process;

e.      Cantor knew that by serving both as collateral manager of Collybus and as manager of the CA Funds, Commonwealth  would have significant input over the value ascribed to the CA Funds by third-party fund administrators;

f.      As collateral manager of Collybus, Commonwealth was positioned to collect substantial performance, transaction and other fees on Collybus.  Thus, it is reasonably believed, and therefore alleged, that Cantor knew that Commonwealth intended to profit from the 2007 Collybus transaction not only as manger of the CA Funds, but also as collateral manager of Collybus.

41.

According to the Collybus prospectus, the average rating of the assets securing Collybus was between Baa3, the lowest possible "investment-grade" rating, and Ba1, which was a "junk" rating.

42.

Upon information and belief, Cantor and Commonwealth knew that the assets securing Collybus either had or would suffer substantial losses and/or significant liquidity issues in the near future and that the ratings assigned by the rating agencies to each of the Collybus tranches were inaccurate and overstated.

43.

Cantor wrongfully participated in the 2007 Collybus deal insofar as the Collybus C, D and/or equity tranches were very high risk investment for plaintiffs and were reasonably expected to suffer losses and/or default; the Collybus C, D and/or equity tranches were illiquid; the creation and sale Collybus involved self-dealing on the part of the defendants, and  was inconsistent with the promises to plaintiffs that the CA Funds would invest in diversified holdings; Commonwealth and Cantor would profit from the 2007 Collybus deal to the plaintiffs' detriment; and the 2007 Collybus deal would negatively impact the liquidity of the plaintiffs' interests in the CA Funds, decrease the net asset value of the CA Funds, and/or obligate the CA Funds to repay Cantor millions of dollars in connection with the purchase of the Collybus C, D and/or equity tranches.

44.

Plaintiffs allege that the foregoing allegations surrounding the 2007 Collybus deal, if accepted as true, constitute negligence, mismanagement of investor funds, misrepresentations and omissions of material fact in the sale of a security, violations of Louisiana Blue Sky law, breach of fiduciary duty and/or breach of contract.  Plaintiffs also allege that a reasonable jury, finding the foregoing allegations to be true, could conclude that Cantor and/or Commonwealth joined together to commit a misrepresentation or suppression of the truth made with the intention

either to obtain an unjust advantage for each other, or to cause a loss or inconvenience to plaintiffs and/or joined together to commit other intentional tortious acts.

45.

Morales and Commonwealth's intentional, negligent and illegal actions, self-dealing, breach of fiduciary duties, unlawful deals and/or other tortious acts in connection with the creation of Collybus and the 2007 Collybus deal were committed without the knowledge or consent of the plaintiffs. Likewise, the plaintiffs did not know, and in the exercise of reasonable care could not have known, that the statements made by Cantor in connection with the 2007 Collybus deal contained untruths and omissions of material fact. Commonwealth and the other defendants acting in concert with them owed ongoing obligations to disclose the true state of the affairs with respect to the CA Funds, the defendants have concealed those facts, and such concealment is ongoing.

46.

As a result of the actions of Cantor, Commonwealth and other defendants in regard to the 2007 Collybus deal, plaintiffs were led to believe that their investments were diversified and, with respect to the investment grade funds, safe, causing the plaintiffs not to take action to protect their assets.

### The "Sale" of Sand Spring

47.

In approximately January of 2008, Commonwealth represented to one or more plaintiffs that it was "selling" Sand Spring Capital, Ltd., one of the Commonwealth-managed funds owned by one or more plaintiffs. As pertains to Broyles, Walter Morales and/or others at Commonwealth told Broyles of the need for his signature to effectuate a transaction and sent a

courier to plaintiffs' office with a signature page for him to sign.  As with previous transactions involving the CA Funds, Morales used his position of trust to take advantage of Broyles, who it was expected would not question Morales' intentions or loyalty to his clients.

48.

The "sale" of Sand Spring was reflected on Broyles' investment statements as the purchase of approximately $600,000 in "March 2008 Series" shares of CA Core Fixed Income Fund, Ltd. and approximately $600,000 in "March 2008 Series" shares of CA Strategic Equity Fund, Ltd.  In other words, it was reflected on Broyles' statements that Sand Spring was liquidated and that the cash from the sale was used to purchase shares of the "March 2008 Series" of CA Core Fixed Income Fund, Ltd. and CA Strategic Equity Fund, Ltd.

49.

Upon information and belief, the Sand Spring sale was not a sale, but rather was a two-part exchange.  First, Commonwealth exchanged Broyles' holdings in Sand Spring for a pro-rata portion of Sand Spring's underlying assets (unknown securities).  Then, Commonwealth exchanged Broyles' interests in the former Sand Spring assets for the "March 2008 Series" of the CA funds.  In short, Commonwealth moved the assets of Sand Spring to two of its other funds, called it a sale, gave Broyles additional, "new" shares in two CA funds, and presumably made money in the process ("the Sand Spring 'sale'").  By engaging in the 2008 Sand Spring "sale," Commonwealth was able not only to create the appearance of liquidity in plaintiffs' holdings, it was presumably able to generate fees and inflate plaintiffs' statements by creating a purported sale.

50.

As a result of the actions of Commonwealth and other defendants in regard to the Sand Spring "sale," one or more plaintiffs were led to believe that their investments were safe, stable and secure, causing these plaintiffs not to take action to protect their investments and/or get out of the CA Funds by requesting that his interests in the CA Funds be redeemed for cash.

51.

To the extent part or all of the Sand Spring "sale" was an actual sale, plaintiffs assert all rights to challenge the sale and Commonwealth's actions therein.  Any cash used by Commonwealth to effectuate the Sand Spring "sale" was cash that belonged, in part, to plaintiffs, and any assets used by Commonwealth to effectuate the Sand Spring sale were assets that belonged, in part, to plaintiffs.

52.

The interests in the CA Funds that were sold to one or more plaintiffs through the Sand Spring "sale" are presently worthless and are not reasonably anticipated to ever have any substantive value.

53.

Plaintiffs allege that the foregoing allegations surrounding the Sand Spring "sale," if accepted as true, constitute negligence, mismanagement of investor funds, misrepresentations and omissions of material fact in the sale of a security, violations of Louisiana Blue Sky law, breach of fiduciary duty and/or breach of contract.  Plaintiffs also allege that a reasonable jury, finding the foregoing allegations to be true, could conclude that Commonwealth committed a misrepresentation or suppression of the truth made with the intention either to obtain an unjust

advantage for itself and the other defendants, or to cause a loss or inconvenience to plaintiffs and/or to commit other intentional tortious acts.

54.

As a result of the actions of Commonwealth in regard to the Sand Spring "sale," one or more plaintiffs were led to believe that their investments were safe, stable and secure, causing plaintiffs not to take action to protect his investments and/or get out of the CA Funds by requesting that their interests in the CA Funds be redeemed for cash.

***The June 2008 Sale of the Collybus A-2 Tranche***

55.

By the summer of 2008, Cantor still had not sold the Collybus A-2 tranche, which had been issued at a face value of $675,000,000 and is believed to have had a principal balance of approximately $610,000,000 as of June, 2008.

56.

Even though the A-2 tranche was the senior tranche by this point in time, and thus was the first tranche to receive principal and interest payments, a legitimate, willing buyer of the A-2 tranche did not exist. The entirety of Collybus was essentially illiquid, and given that the A-2 tranche was still owed approximately $610,000,000 in principal and interest rates were expected to continue to drop, Cantor was faced with incurring large losses if it did not somehow sell the Collybus A-2 notes.

57.

Likewise, Commonwealth found itself in a desperate situation. The C, D and equity tranches of Collybus were worthless. Although plaintiffs were not seeing a significant drop in their holdings on their statements in the first half of 2008 (because such a loss was not disclosed

to them), Commonwealth knew that the CA Funds in fact had sustained huge losses. Commonwealth also knew that it was only a matter of time before these losses were reflected on plaintiffs' statements unless something were done to inflate the value of the CA Funds' holdings, including the value of the Collybus C and D tranches.

58.

Thus, on or about June 4, 2008, Cantor and Commonwealth entered into a deal for the sale of the Collybus A-2 tranche, Series 2007-1A Class A-2 Notes (CUSIP 19516PAB7), with the intention to benefit one another as alleged herein, to the detriment of the plaintffs.

59.

The sale of the Collybus A-2 tranche in June of 2008, and all agreements, actions and transactions by or between Cantor and Commonwealth and their officers, directors, agents, and/or employees regarding same, are referred to as "the June 2008 Collybus deal."

60.

As part of the June 2008 Collybus deal, Commonwealth engaged in a complex series of undisclosed transactions with third parties and other Commonwealth-controlled funds in order to generate cash for the purchase of the Collybus A-2 tranche.

61.

Some assets of the CA Funds were "sold" by the CA Funds to another Commonwealth fund, the Sand Spring Capital III Master Fund. By selling the assets of the CA Funds to Sand Spring Capital III Master Fund, Commonwealth once again was able to manipulate the value reflected on plaintiffs' statements and create a "sale" of its funds' assets by moving assets from one Commonwealth fund to another. Moreover, Commonwealth was able to artificially inflate the value of assets held by the CA Funds, obtain cash for the purchase of Collybus and ostensibly

generate substantial fees in the process, in part by "selling" CA Fund assets to Sand Spring Capital III Master Fund.

62.

Upon information and belief, Commonwealth impermissibly used plaintiffs' valuable assets and cash to effectuate the 2008 Collybus deal and/or to purchase the Collybus A-2 tranche. Upon information and belief, many of the CA Funds' assets that were sold as part of the purchase of the Collybus A-2 tranche were marketable and capable of liquidation for substantial value, which would have generated cash to plaintiffs.  Plaintiffs allege that, had the 2008 Collybus deal not taken place, the CA Funds would still hold the assets that were given up in the 2008 Collybus deal and the CA Funds currently would be capable of liquidation at substantial value to plaintiffs.

63.

The cash generated by the liquidation of the CA Funds was used by Commonwealth to purchase the entire Collybus A-2 tranche.

64.

Upon information and belief, most of the sale of the A-2 tranche was financed by Cantor under a repurchase agreement.  It is reasonably believed, and therefore alleged, that in simultaneous transactions, Cantor sold the A-2 tranche of Collybus to the CA Funds and other Commonwealth-controlled funds and then bought the A-2 tranche back under the first part of a repurchase agreement at a fraction of the sale price.  This rather complicated transaction resulted in an immediate payout to Cantor of approximately $100,000,000, with approximately $300,000,000 to be paid by the CA Funds and other Commonwealth-controlled funds within two years through the repurchase of the A-2 tranche from Cantor.

65.

Thus, after the June 2008 Collybus deal, the CA Funds all held the same, single, illiquid asset: the A-2 tranche of Collybus.

66.

At all pertinent times during the 2008 Collybus deal, Cantor acted as the seller of the Collybus A-2 notes, or alternatively, as Collybus' selling agent, dealer and/or salesman.

67.

The Collybus A-2 tranche purchased by Commonwealth on behalf of the CA Funds is presently illiquid and is not reasonably anticipated to be marketable in the future.  Consequently, Investors are unable to liquidate their investments in the CA Funds.

68.

Upon information and belief, the CA Funds and other Commonwealth-controlled funds have paid Cantor in excess of $400,000,000 for the Collybus A-2 tranche.

69.

In addition to allowing for debt avoidance and artificial inflation of Investors' holdings, the June 2008 sale of Collybus is believed to have generated a substantial amount of cash for the benefit of Cantor and Commonwealth.

70.

Upon information and belief, Cantor knew that Commonwealth was benefitting from the June 2008 sale of Collybus to the detriment of plaintiffs.  For example, Cantor knew that the A-2 notes were illiquid, that Commonwealth was using the CA Funds' cash to purchase the worthless notes, and that the CA Funds would be left holding the A-2 tranches of Collybus.  Cantor also knew that Commonwealth was artificially inflating the value of plaintiffs' holdings through the

2008 Collybus sale and that it stood to profit from the sale.  Cantor knew that the CA Funds were using leverage to complete the sale and that the sale would result in the CA Funds owning a single, illiquid asset and that such a high concentration of holdings was inconsistent with the governing documents for the CA Funds and the representations of diversification used to sell the CA Funds.

71.

Plaintiffs allege that the foregoing allegations surrounding the 2008 Collybus deal, if accepted as true, constitute negligence, mismanagement of investor funds, misrepresentations and omissions of material fact in the sale of a security, violations of Louisiana Blue Sky law, breach of fiduciary duty and/or breach of contract.   Plaintiffs also allege that a reasonable jury, finding the foregoing allegations to be true, could conclude that Cantor and/or Commonwealth joined together to commit a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for each other, or to cause a loss or inconvenience to the CA Funds and their Investors and/or joined together to commit other intentional tortious acts.

72.

Cantor wrongfully participated in the 2008 Collybus deal insofar as the Collybus A-2 tranche was illiquid and a very high-risk investment for owners of the CA Funds; the sale of the Collybus A-2 tranche was an inside, self-serving, unlawful deal between Cantor and Commonwealth; it was unlikely that the CA Funds would ever profit from the purchase of the Collybus A-2 tranche, considering its illiquidity and the leverage used to purchase the asset; Cantor would have the right to "repossess" the Collybus A-2 tranche in the event of a default by Commonwealth, which would leave the CA Funds with nothing; that Commonwealth and Cantor would profit from the 2008 Collybus deal to the CA Funds' detriment; and that the 2008

Collybus deal would negatively impact the liquidity of the CA Funds, decrease the net asset value of the CA Funds, and/or obligate the CA Funds to repay Cantor millions of dollars in connection with the purchase of the Collybus A-2 tranche.

73.

Morales and Commonwealth's intentional, negligent and illegal actions, self-dealing, breach of fiduciary duties, unlawful deals and/or other tortious acts in connection with the 2008 Collybus deal were committed without the knowledge or consent of the plaintiffs. Likewise, the plaintiffs did not know, and in the exercise of reasonable care could not have known, that the statements made by Cantor in connection with the 2008 Collybus deal contained untruths and omissions of material fact.

74.

As a result of the actions of Cantor, Commonwealth and other defendants in regard to the 2008 Collybus deal, plaintiffs were led to believe that their investments were safe, stable and secure, causing the CA Funds not to take action to protect their investments.

**CONTINUED MISREPRESENTATION AND/OR WITHHOLDING INFORMATION CONCERNING OF THE VALUE OF FUNDS AND COLLECTION OF FEES THEREON**

75.

After the 2008 Collybus deal and continuing through 2008, 2009, 2010 and into 2011, Commonwealth has continued to sell one or more of the CA Funds without disclosing the excessive and highly risky concentration of investments in Collybus, and also to misrepresent and/or withhold information concerning the value of the CA funds to plaintiffs. Commonwealth has continued to collect substantial management fees based on the inflated values of the CA Funds as claimed by Commonwealth, when it is believed that the CA Funds in reality have had little or no market value since the 2008 Collybus deal. Moreover, Commonwealth continued its

attempt to lead plaintiffs to believe that their investments were safe, stable and secure, causing plaintiffs not to take action to protect their investments and/or get out of the CA Funds by requesting that their interests in the CA Funds be redeemed for cash.

76.

For example, the May 31, 2008, NAV (net asset value) of the CA Strategic Equity Offshore Fund, Ltd. was reflected on Broyles' statement as being 1,082.94 per share.  One month later on June 30, 2008 (immediately following the 2008 Collybus deal), the NAV for this same fund was shown on Broyles' statement as having increased to 1,520.51, a jump of over 40% in one month, presumably by virtue of the 2008 Collybus deal.  Toward the end of 2008, the statement values of the CA Funds began to show a decline.  Thus, the January 31, 2008, value for the CA Strategic Equity Offshore Fund, Ltd. was reflected on Broyles' statement as being 1,049.709380 per share.  These values, however, were still grossly inflated, and they remained this way throughout most of 2009.  Indeed, the November 30, 2009, value for the CA Strategic Equity Offshore Fund, Ltd. was shown to be 1,031.140293, just slightly lower than its reported value in January of 2009.

77.

However, beginning in 2010, there apparently was some attempt made to adjust the values of the CA Funds downward.   While the November 30, 2009, net asset value of CA Strategic Equity Offshore Fund, Ltd. was represented as being 1,031.140293, its value as of December 31, 2009, was reflected as being 529.347303, *a drop of over 40% in one month*.  This December statement 2009 was dated February 1, 2010, and was not received by Broyles and other plaintiffs until February 2010 at the earliest.

78.

Upon information and belief, there is no rational basis for the drastic drop in the reported value of the CA Funds in one-month's time from November 2009 to December 2009, as the assets of the CA Funds are not believed to have changed during this time preceding this valuation – the assets of the CA Funds were, and remain, comprised overwhelmingly of the Collybus A-2 tranche.

79.

Although the 2010 and 2011 values of the CA Funds were reflected on plaintiffs' statements as being substantially lower than 2009, plaintiffs believe that even these values are inflated, as the CA Funds all hold Collybus A-2 as their main asset, and the CA Funds are presently illiquid.  Nevertheless, Commonwealth continues to collect a management fee based on the values of the CA Funds reported on plaintiffs' statements.

80.

Also, the CA High Yield Fund, LLC; CA Core Fixed Income Fund, Ltd.; CA Core Fixed Income Fund, LLC; and CA Strategic Equity Offshore Fund, Ltd. were reflected on Commonwealth's August 4, 2010, Form ADV filed with the federal government as having values of $10,048,886; $13,062,948; $51,067,304; and $3,758,862, respectively, for a total net value of $77,938,000.  Compared to the values reported on the CA Funds' 2007 year-end financials, these 2010 values represent approximately 52% of the CA Funds' reported 2007 year-end net value.  Plaintiffs also believe that these valuations of the CA Funds are inflated and misleading, as the funds all hold Collybus A-2 as their main asset, and the CA Funds are presently illiquid.

**CLAIMS FOR RELIEF**

As fully alleged herein, the actions of the defendants, Cantor Fitzgerald & Co., and its officers, employees, and control persons, Commonwealth Advisors, Inc., and its officers, employees and control persons, including Walter A. Morales III, Jennifer O. Morales, James F. O'Beirne, Noel Caldwell, Willie Gerald Warrington, Jr., as alleged in the preceding paragraphs, violate Louisiana and other state law and render the defendants liable *in solido* to the plaintiffs for general and special damages, recession of the sale of securities and return of the purchase price, interest from the sale date until paid, all recoverable costs and attorney's fees.

81.

Although previously alleged with particularity, the wrongdoings of the defendants may be summarized as, but are not necessarily limited to, the following violations of Louisiana law and, where applicable, the law of other states:

  a.  Violations of Louisiana Blue Sky law, La. R.S.51:701 *et seq.*;

  b.  Negligent and/or intentional misstatements and omissions of the truth;

  c.  Negligent and/or intentional mismanagement of the CA Funds;

  d.  Breach of fiduciary duty;

  e.  Negligent and/or intentional misrepresentations of material fact and omissions of material fact in connection with the sale of securities;

  f.  Violations of La. C.C. art. 2315; and

  g.  Breach of contract and/or absolute nullity of contract, such as nullity for want of lawful cause, where the unlawful cause was known, or should have been known, by the Cantor defendants and the Commonwealth defendants.

82.

Additionally, it is alleged that a reasonable jury, finding the preceding allegations to be true, will conclude that the creation and/or sales of Collybus was intended by Cantor and Commonwealth to mutually benefit the parties to the detriment of the CA Funds.

83.

Additionally, it is alleged that a reasonable jury, finding the preceding allegations to be true, will conclude that the defendants are liable for having joined together to commit any acts of wrongdoing alleged herein, including a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for each other, or to cause a loss or inconvenience to the CA Funds and/or for having joined together to commit other intentional and/or negligent, tortious acts in violation of Louisiana or other state law.

84.

By virtue of their wrongdoings as alleged herein, Cantor and Commonwealth (and all persons for whom they are responsible) are solidarily liable to the plaintiffs for all recoverable damages.

85.

Walter A. Morales III, Jennifer O. Morales, James F. O'Beirne, Noel Caldwell, and Willie Gerald Warrington, Jr., as directors, executive officers, direct or indirect controlling persons of Commonwealth, are liable jointly and severally with, and to the same extent as, Commonwealth.

86.

Commonwealth is vicariously liable for any tortious acts of Walter A. Morales III, Jennifer O. Morales, James F. O'Beirne, Noel Caldwell, Willie Gerald Warrington, Jr., and any

other employees or agents, which were committed in the course and scope of their employment or agency.

87.

Cantor, as a controlling person of Commonwealth, is liable jointly and severally with, and to the same extent as, Commonwealth.

**DAMAGES**

88.

Plaintiffs are currently unable to redeem their investments in the CA Funds.  Upon information and belief, on or about December 31, 2008, Commonwealth unilaterally suspended redemptions in the CA Funds without any warning to plaintiffs and without any formal written notice after the fact.  The suspension of redemptions was not discovered until much later.

89.

In addition to all other allegations set forth herein, as direct and foreseeable consequence of the actions of the defendants as alleged herein, plaintiffs have sustained millions of dollars in losses comprised of diminution in the value of their investments, payments made by Commonwealth to Cantor that should have paid pro rata to plaintiffs,  "fees" which have been collected by the defendants in connection with their tortious actions, and monies paid by plaintiffs as a consequence of inflated and/or false valuations of their holdings in the CA Funds. Thus, plaintiffs seek to recover their pro rata portion of all cash paid and the fair value of all consideration given, valued at the time given, in connection with the sales of Collybus and any Collybus-related transactions, plus legal interest from the purchase dates until paid, upon or in exchange for the sale or tender of Collybus or its underlying assets to any defendants or any third party, less any income earned by the plaintiffs on the asset, to the extent required by law; all

"fees" and other money charged or taken in connection with the defendants' tortious actions, such as the charging and collection of transaction and management fees; damages for the diminution in value of plaintiff's interests in the CA Funds caused by the actions of the defendants; all sums paid by plaintiffs as a consequence of inflated and/or false valuations of their holdings in the CA Funds, the full amount of all other financial losses sustained by the plaintiffs as a consequence of the acts of the defendants; a reasonable sum in exchange for the CA Funds' holdings in Collybus or any securities or other assets underlying Collybus, which will then be paid pro rata to plaintiffs; as well as all other damages and special relief available to them under the law, all recoverable costs, legal interest from date of sale and/or date of filing until paid; and reasonable attorney's fees.  Plaintiffs also, or alternatively, seek a finding that the 2007 & 2008 Collybus deals, and all related transactions and agreements, including any indemnity agreements, are absolutely null, thereby returning plaintiffs' investments in the CA Funds to the position they were in prior to the transactions, which may include payment of damages by the defendants.

## PRAYER

WHEREFORE, plaintiffs Joseph N. Broyles, M. Badi Asbahi,  Preston Cloyd, Steve Collins and Eileen Collins, Charles and Anne Richey, Susan B. Beninati, Russ P. Barranco, Janice B. Virgadamo, Jody A. Barranco, Karen L. Barranco, the Municipal Employee's Retirement System of Louisiana and the Registrar of Voters Employee Retirement System pray for a trial by jury; and

Plaintiffs pray that after due proceedings are had, there be judgment in their favor and against Cantor Fitzgerald & Co., Commonwealth Advisors, Inc., Walter A. Morales III, Jennifer O. Morales, James F. O'Beirne, Noel Caldwell, and Willie Gerald Warrington, Jr., *in solido*, for

an amount reasonable in the premises, legal interest from date of judicial demand until paid, all costs of these proceedings, reasonable attorney fees, and all other general and equitable relief recoverable under the law.

BY ATTORNEYS:

/s/ Patrick N. Broyles
Patrick N. Broyles (TA), La. Bar Roll No. 29109
**BROYLES LAW FIRM, LLC**
412 N. 4th Street, Sute 230
Baton Rouge, Louisiana 70802
Telephone: (225) 663-2223
Facsimile: (225) 208-1670
Email: broyles@broyleslawfirm.com

AND

/s/ Kirk Reasonover
Kirk Reasonover (TA), La. Bar No. 21061
**REASONOVER AND OLINDE, LLC**
400 Poydras Street, Suite 1980
New Orleans, Louisiana 70130
Telephone: (504) 587-1440
Facsimile: (504) 587-1577
Email: kreasonover@reasonoverolinde.com

AND

/s/ Jim Swanson
James R. Swanson (TA), La. Bar Roll No. 18455
**FISHMAN HAYGOOD PHELPS WALMSLY WILLIS & SWANSON, L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: jswanson@fishmanhaygood.com

*Attorneys for plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 4th day of November, 2011, undersigned counsel electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

<u>/s/ Patrick N. Broyles</u>
Patrick N. Broyles