UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH N. BROYLES<br><br>v.<br><br>CANTOR FITZGERALD & CO., *ET AL*. | CIVIL ACTION NO.: 3:10-854-JJB-SCR |

**Consolidated with:**

| | |
|---|---|
| JOSEPH N. BROYLES, *ET AL*., AS REPRESENTATIVES OF CA HIGH YIELD FUND, LLC; CA HIGH YIELD OFFSHORE FUND, LTD.; CA CORE FIXED INCOME FUND, LLC; CA CORE FIXED INCOME OFFSHORE FUND, LTD.; CA STRATEGIC EQUITY FUND, LLC; AND CA STRATEGIC EQUITY OFFSHORE FUND, LTD.<br><br>v.<br><br>CANTOR FITZGERALD & CO., *ET AL*. | CIVIL ACTION NO.: 3:10-857-JJB-SCR |

THIS PLEADING APPLIES TO CIVIL ACTION NO. 3:10-854.

**<u>SECOND AMENDED AND RESTATED COMPLAINT</u>**

NOW COME plaintiffs, Joseph N. Broyles, domiciled in the parish of East Baton Rouge, State of Louisiana; M. Badi Asbahi, domiciled in the parish of Livingston, State of Louisiana; Preston Cloyd, domiciled in the parish of Lafayette, State of Louisiana; Steve Collins and  Eileen Collins, husband and wife, domiciled in the parish of East Baton Rouge, State of Louisiana; Charles and Anne Richey, husband and wife, domiciled in the Parish of Sabine, State of Louisiana; Susan B. Beninati, domiciled in the Parish of Orleans, State of Louisiana; Russ P. Barranco, domiciled in the Parish of Orleans, State of Louisiana; Janice B. Virgadamo, domiciled in the Parish of Jefferson, State of Louisiana; Jody A. Barranco, domiciled in the Parish of Jefferson, State of Louisiana; Karen L. Barranco, domiciled in the County of Los Angeles, State of California; Louisiana the Municipal Employee's Retirement System of Louisiana, domiciled in the parish of East Baton Rouge, State of Louisiana; the Firefighters' Retirement System ("Firefighters") domiciled in the parish of East Baton Rouge, State of Louisiana; and the Registrar of Voters Employee Retirement System, ROVERS, domiciled in the parish of East Baton Rouge, State of Louisiana ("plaintiffs"), who respectfully amend and restate the petition for damages initially brought by Joseph N. Broyles in Louisiana State Court and thereafter removed to this Court as follows:

**1.**

The present suit is brought exclusively under state law and asserts only the claims of the plaintiffs specifically named in this amended complaint.  The plaintiffs do not assert any claims based on federal law, and no claims are made on behalf of other unnamed persons or any class thereof.  The claims asserted herein involve injuries to Louisiana residents and will be governed predominantly by Louisiana law.

437637v.6

**OVERVIEW**

**2.**

The present suit arises out of the defendants' creation, structuring, management, offering, placement, sale, and/or valuation of, as well as other transactions relating to, Collybus CDO I Ltd. and/or Collybus CDO I Corp. ("Collybus"), a collateralized debt obligation ("CDO") issued at a face value of approximately $1.012 billion (U.S.), as well as the defendants' tortious acts surrounding the sale of securities, self-dealing by and between the defendants, breach of contract, breach of fiduciary duty, aiding and abetting, conspiracy to commit, and knowing participation in that breach of fiduciary duty, mismanagement of the plaintiffs' assets, misrepresentations, misstatements and omissions of material fact made to the plaintiffs in connection with the sale of Pooled-Asset Funds, Collybus and/or other security-related transactions, other violations of state law, and conspiracy to commit any or all of the above, any and all of which acts have caused plaintiffs to sustain millions of dollars in losses.

**3.**

In mid- to late-2007, when the United States housing market was in apparent distress and subprime residential mortgage-backed securities ("MBS") – and the structured investment vehicles (such as CDOs) which held subprime MBS – were rapidly losing value and facing illiquidity, Walter A. Morales ("Walter" or "Morales"), Commonwealth Advisors, Inc. ("Commonwealth"), acting through its officers, directors, employees and control persons, including Morales, and Cantor Fitzgerald and Co. ("Cantor") together created, structured, managed, offered, placed and/or sold Collybus, a cash-flow CDO backed primarily by MBS, including subprime MBS and MBS of young vintage which were anticipated to experience defaults or other adverse credit events in

3

the near future, in order to, *inter alia*, avoid write-downs, repackage devalued MBS unload these MBS, inflate the reported value of Investors' portfolios, and generate substantial transaction and management fees for the parties, all without the knowledge of plaintiffs and to their extreme detriment.  Due to the defendants' actions, plaintiffs have lost well over half the money they invested.

## SUMMARY OF FACTS

### Background: The Parties and the Pooled Funds.

### 4.

### Commonwealth Advisors, Inc.

Commonwealth Advisors, Inc., a registered investment advisor and Louisiana corporation with its registered office located at 315 Third Street, Baton Rouge, Louisiana 70801, held itself out to investors in its marketing materials as a "[m]ulti-strategy value based money management firm established in 1991 focused on achieving superior absolute returns in investment grade, high yield and distressed securities."  As of July 11, 2007, Commonwealth claimed to have approximately $320-350 million in assets under management.

### 5.

### Walter Morales

Walter Morales, an individual domiciled and residing in the State of Louisiana, Parish of East Baton Rouge, is the founder, President, Managing Partner, and Chief Investment Officer of Commonwealth.  Walter Morales "is a Chartered Financial Analyst and oversees the firm's active management of balanced, fixed income and distressed asset portfolios."  *See* http://www.common.com/bios/morales.html.  Walter personally solicited investments from individual and Pension Fund investors, including the

4

plaintiffs.  He held himself out as an expert in portfolio management, fixed income securities and valuation.  Over the years, Walter had developed a reputation in the Baton Rouge community as a conservative, knowledgeable fixed income investment advisor, and he took advantage of this reputation to obtain investors for the pooled Funds involved in these law suits.

## 6.

### Plaintiffs

Plaintiffs are individuals and municipal Pension Funds who invested in one or more of the pooled-asset Funds created and managed by Commonwealth Investment Advisors, Inc. and Walter Morales.  They are named as follows:

**a.** Joseph N. Broyles, an individual residing and domiciled in the State of Louisiana, Parish of East Baton Rouge;

**b.** M. Badi Asbahi, an individual residing and domiciled in the State of Louisiana, Parish of Livingston;

**c.** Preston Cloyd, an individual residing and domiciled in the State of Louisiana, Parish of Lafayette;

**d.** Steven Collins and Eileen Collins, husband and wife, residing and domiciled in the State of Louisiana, Parish of East Baton Rouge;

**e.** Charles and Anne Richey, husband and wife, residing and domiciled in the State of Louisiana, Parish of Sabine;

**f.** Susan B. Beninati, residing and domiciled in the State of Louisiana, Parish of Orleans;

**g.** Russ P. Barranco, residing and domiciled in the State of Louisiana, Parish of Orleans;

**h.** Janice B. Virgadamo, residing and domiciled in the State of Louisiana, Parish of Jefferson;

**i.** Jody A. Barranco, residing and domiciled in the State of Louisiana, Parish of Jefferson;

**j.** Karen L. Barranco, residing and domiciled in the State of California, County of

437637v.6

Los Angeles.

**k.**     Municipal Employee's Retirement System of Louisiana ("MERS"), a statutorily-chartered government entity with the powers and privileges of a corporation, including the power to sue and be sued in its own name, and an arm of the State of Louisiana, performing a valuable and essential state function and managed by a Board of Trustees, whose members are appointed pursuant to Louisiana law and who have authorized the filing of this actions. MERS resides and is domiciled in the Parish of East Baton Rouge, State of Louisiana; and

**l.**     The Registrar of Voters Employee Retirement System ("ROVERS"), a statutorily-chartered government entity with the powers and privileges of a corporation, including the power to sue and be sued in its own name, and an arm of the State of Louisiana, performing a valuable and essential state function and managed by a Board of Trustees, whose members are appointed pursuant to Louisiana law and who have authorized the filing of this actions. ROVERS resides and is domiciled in the Parish of East Baton Rouge, State of Louisiana.

**m.**    The Firefighters' Retirement System ("Firefighters") is responsible for overseeing the Pension Funds of Louisiana Firefighters.  Firefighters resides and is domiciled in the Parish of East Baton Rouge, State of Louisiana.

## 7.

### Pension Funds

The Municipal Employees' Retirement System of Louisiana ("MERS") is responsible for overseeing the pensions of certain Louisiana municipal employees.  LSA-R.S. 11:1731.  The Registrar of Voters Employees' Retirement System ("ROVERS") is responsible for overseeing the Pension Funds of employees of the Louisiana Registrar of Voters.  LSA-R.S. 11:2032.  The Firefighters' Retirement System ("Firefighters") is responsible for overseeing the Pension Funds of Louisiana Firefighters.

## 8.

### Individual Investors

The individuals named herein (the "Individuals" or Individual Plaintiffs") are retired or near retirement and so required conservative investment strategies.  They sought out Morales because he held himself out as a fixed income specialist and

437637v.6

conservative investment advisor.  Walter was well aware that many of his investors were retired and therefore needed to minimize risk.  Many of the Individual Plaintiffs invested their life savings with Commonwealth, relying on Walter's representations that their investment would be invested in a manner consistent with their objectives.  As an example, named plaintiff Dr. Joseph Broyles, a sixty-six-year-old, well-known OB/GYN nearing retirement, invested approximately $3 million with Commonwealth with the intention that this investment would be invested conservatively in order to fund his retirement, which at the time of Broyles' initial investment with Commonwealth was supposed to occur in approximately five years.  Now, based on Commonwealth's figures, Broyles has approximately $750,000 left; however, this amount is believed to be even less given the illiquidity of Broyles' current investment holdings.  Because of his substantial losses, Broyles cannot retire.

**9.**

The above named natural and juridical persons, herein collectively "plaintiffs," were at all pertinent times clients of Walter A. Morales and Commonwealth, which acted as investment advisor to plaintiffs and owed all of the fiduciary and other duties commensurate with such a position.  Plaintiffs were, and still are, invested in one or more pooled-asset funds created and managed by Commonwealth, which hold portions of the Collybus CDO.

**10.**

**Commonwealth's Investors Sought a Conservative Investment Strategy.**

Commonwealth's investors were generally hoping for a fixed income return that did not involve the risk of a loss of principal.  Most investors were not seeking an equity

437637v.6

level of risk and certainly did not want margin or leverage.  Indeed, plaintiffs were unaware that Walter planned to use leverage as a significant aspect of his investment strategy.  Plaintiffs could not conceive that Walter would use such tactics; he even publically spoke against leverage, calling the incidence of leveraging in 2007 "dangerous." He also publically warned against hedge funds in an article titled "Cutting Hedge," published on June 19, 2007 in the *Baton Rouge Business Report*, saying, "You have to be a pretty sharp investor to be able to feel comfortable that you are not going to get ripped off in a hedge fund…One of the real ironies is that some of the highest returns come from newer and smaller [hedge fund] managers. But they're also the riskiest to give money to."

### 11.

### Walter and Commonwealth were
### fiduciaries of the Investors.

Walter and Commonwealth were fiduciaries of the investors and they were required to act primarily for the benefit of the investors and they owed a special duty to protect the investors' interests.    Moreover, Walter and Commonwealth had an RIA relationship directly with the plaintiffs.  Because he is a RIA, Walter owed the investors a fiduciary duty, which included a duty of loyalty that required complete disclosure and in-advance informed and voluntary consent before engaging in self-interested transactions with obvious financial conflicts of interest and also included a duty of complete disclosure, which meant he could not conceal risks and fund activities.

### 12.

### Walter formed pooled funds.

Initially, Walter managed individual investment portfolios for individual

investors, including Individual Plaintiffs. Beginning in 2005, Walter formed pooled investment funds (collectively, the "Funds," the "Commonwealth Funds," or the "Pooled Funds"), which he intended to use to replace the individual managed portfolios. He touted these Funds (in a Q&A circular) as a way for individual investors to diversify while remaining loyal to the conservative objective of income with minimal risk. He suggested that the Funds would reduce risk because instead of holding a few bonds, the investors would hold a fractional interest in many meaning they would be more diversified. He also explained that the Pooled Funds would allow him greater flexibility while retaining the same investment objectives. Walter led his investors to believe that the Pooled Funds were created to give them greater buying power, and he assured investors that their asset allocation strategy would remain the same.

**13.**

On October 25, 2011, the Funds filed for a voluntary petition for bankruptcy in the U.S. Bankruptcy Court, District of Delaware.

**14.**

**Each of the Funds each had a unique investment objective.**

The Funds explained the investment objective in each bankruptcy filings:

- **CA Core Fixed Income Fund, LLC and CA Core Fixed Income Fund, Ltd:** The investment objective of the "Fixed Income Funds" was to provide investors with a return exceeding that of the Lehman Brothers Aggregate Bond Index, a broad-based investment grade bond index. The Fixed Income Funds sought to achieve that objective primarily through investment in a diversified portfolio of fixed income securities, primarily investment grade;

- **CA High Yield Fund, LLC and CA High Yield Offshore Fund, Ltd.:** The investment objective of the "High Yield Funds" was to provide investors with a return exceeding that of the Lehman Brothers High Yield Composite Bond Index, a broad-based high yield bond index. The High

9

Yield Funds sought to achieve that objective by investing in a diversified portfolio of fixed income securities, primarily non-investment grade;

- **CA Strategic Equity Fund, LLC and CA Strategic Equity Offshore Fund, Funds, Ltd**.:  The investment objective of the "Strategic Equity" was to provide investors with a return exceeding that of the Dow Jones Wilshire 5000 Composite Index, a broad-based equity index. The Strategic Equity Funds sought to achieve that objective primarily through investment in a diversified portfolio of equity securities;  and

- **Sand Spring Capital III, LLC and Sand Spring Capital III, Ltd. (through Sand Spring Capital III Master Fund, LLC):**  The investment objective of each of the "Sand Spring Funds" was to provide investors with positive absolute returns over the long term by seeking investments in a wide variety of opportunities in distressed and highly leveraged companies. The Sand Spring Funds sought to achieve that objective primarily through investment in the distressed financial instruments of North American companies and subordinated tranches of asset-backed securitizations.

Many investors invested in more than one of these funds because each fund served a different purpose and each purportedly had different risk/reward characteristics. The Core Fixed Fund was supposedly the most conservative, least risky of the funds. None of the Individual Plaintiffs were invested in the Sand Spring Funds.

## 15.

### The Funds were billed as vehicles for investing in diversified portfolios with very limited leverage.

The Funds had the authority to borrow money but, as explained in the Private Placement Memoranda for the Funds, each Fund represented that it intended "to use leverage primarily for liquidity purposes and to temporarily cover its obligations in connection with the settlement of trades."  In fact, on January 10, 2007, Walter informed the Firefighters that "[b]y and large, it is not a part of our investment strategy to borrow." And, the Funds were described as diversified portfolios.  Publicly and privately, Walter warned his investors of the dangers of using leverage, bolstering investors' beliefs that

10

the pooled Funds were low-risk investments.

**16.**

**Cantor Fitzgerald & Co., a major bond broker, sold Mortgage Backed Securities to the Funds, loaned money to the Funds, and structured the Collybus CDO.**

Walter bought bonds for the Funds from Cantor and Cantor often financed these purchases using repurchase agreements ("repos"). Cantor also was the placement agent for the Collybus CDO, which is discussed in detail below, and was the ultimate decision-maker regarding its structure. Through these various relationships, Cantor knew the Funds' investment objectives. Cantor knew exactly how Walter was compensated by the Funds and understood his motivations for the actions which are outlined below. Cantor had done due diligence regarding the Funds at various times for purposes of extending credit and formulating the CDO disclosures. Cantor had reviewed Walter's Form ADV, which was attached to the CDO circular that Cantor drafted. Cantor also owed a duty to "know its customer" as exemplified by various industry rules and well-established industry conventions. *See e.g.,* New York Stock Exchange Rule 405 (providing that members of the Exchange are required to "[u]se due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization."). From this relationship, Cantor was aware that Walter and Commonwealth owed their investors, including plaintiffs, a fiduciary duty. Under applicable state law, Cantor was prohibited from knowingly acting to harm the Fund Investors who were the intended beneficiaries of the Funds and providing assistance, support, and aid to Morales and Commonwealth to help them breach their duties to the investors.

**17.**

**Cantor is subject to the jurisdiction of this Court.**

Cantor is a New York partnership and investment bank with its principal place of business located at 110 East 59th Street, 4th Floor, New York, New York 10022.  Cantor is subject to the jurisdiction of this court for having caused injuries to Louisiana residents through the creation and sale of securities in Louisiana; for having joined together with one or more Louisiana residents to commit tortious acts against Louisiana residents; for having regularly conducted business with Commonwealth, a Louisiana corporation; for having created, underwritten, and sold a CDO that caused injuries to Louisiana residents, when, at the time the CDO was placed into the stream of commerce, it was reasonably foreseeable that the CDO would cause this harm; and for having engaged in activities directed at the State of Louisiana when it was reasonably foreseeable that Cantor could be sued in Louisiana for having engaged in such activities, as more fully alleged below.

**18.**

Plaintiffs' investments in the Pooled Funds as of December 2011 are approximated in the chart below:

| Client | Fund | Capital Contribution | Current Value |
|---|---|---|---|
| Asbahi, Dr. M. Badi | CASELTD | $599,271 | $127,562.93 |
| Total | | **$599,271** | **$127,562.93** |
| | | | |
| Broyles, Dr. Joseph | CAHYLLC | $259,749 | $104,663.17 |
| | CAFILTD | $1,791,109 | $374,083.58 |
| | CASELTD | $894,821 | $288,529.22 |

12

| | | | |
|---|---|---|---|
| | CACFILLC | $233,171 | $36,757.62 |
| Total | | **$3,178,850** | **$804,033.59** |
| | | | |
| Cloyd, Preston | CAHYLLC | $23,142 | $9,324.96 |
| | CAHYLTD | $1,002,666 | $315,210.07 |
| | CACFILTD | $242,908 | $50,732.78 |
| | CACFILLC | $57,429 | |
| Total | | **$1,326,145** | **$375,267.81** |
| | | | |
| Collins, Steven & Eileen | CAHYLLC | $365,903 | $110,588.03 |
| | CAHYLTD | $113,930 | $36,746.40 |
| | CAHYLTD | $70,039 | $22,588.48 |
| | CACFILTD | $2,806 | $586.08 |
| | CACFILLC | $757,954 | $271,954.68 |
| | CACFILLC | $239,161 | $85,811.11 |
| | CASELLC | $300,850 | $117,536.54 |
| Total | | **$1,850,643** | **$645,811.32** |
| | | | |
| Richey, Charles & Anne | CACFILLC | $371,883 | $133,431.79 |
| | CACFILTD | $219,752 | $45,896.51 |
| | CACFILTD | $267,852 | $55,942.52 |

| | | | |
|---|---|---|---|
| | CAHYLTD | $288,047 | $92,905.49 |
| | CAHYLTD | $358,183 | $115,526.71 |
| Total | | **$1,505,717** | **$443,703.02** |
| The Barrancos (Susan B. Beninati, Russ P. Barranco, Janice B. Virgadamo, Jody A. Barranco, and Karen L. Barranco are collectively referred to as "The Barrancos"). | CACFILLC | **$240,000** | **$125,306** |
| | CAHYLLLC | **$125,306.90** | **$32,691.70** |
| Total | | **$365,307** | **$157,997.70** |
| MERS | Core Fixed | **$20,000,000.00** | **$6,180,345.00** |
| | Sand Spring | **$10,000,000.00** | **$279,050.00** |
| | CA Recovery | **$14,201,592.00** | **$9,523,647.00** |
| Total | | **$44,201,592.00** | **$15,983,042.00** |
| ROVERS | Sand Spring | **$2,000,000.00** | **$53,247.05** |
| | CA Recovery | **$ 807,770.98** | **$996,224.93** |
| Total | | **$2,807,770.98** | **$1,049,471.98** |
| Firefighters | Core Fixed | **$30,000,000.00** | **$14,676,036.00** |
| | Sand Spring | **$22,000,000.00** | **$752,107.00** |
| | CA Recovery | **$11,324,283.03** | **$13,923,929.00** |
| Total | | **$63,324,283.03** | **$29,352,072.00** |

These values reflect gross contributions and do not account for distributions of principal or interest. The amounts reflected for Capital Contributions into the CA

14

Recovery Fund include the following amounts that were transferred from the Sand Spring Funds:  4,201,592 for MERS, 807,770.98 for ROVERS, and 11,324,283 for Firefighters.

**19.**

**Walter earned a percentage fee**.

For the pooled Funds, Walter was compensated based on a percentage of assets under management (.9% per year for the Core Fixed and 1.3% for the High Yield and Equity Funds and 2% for the Sand Spring Fund) with an upside performance bonus based on annual gains (of 10% for the Core and 20% for the High Yield and Equity Funds).  As an example, the Core Fixed Income LLC Private Placement Memorandum provided that, "[a]s of the last Business Day of each calendar year, 10% of the excess of the (i) Net Capital Appreciation less any Net Capital Depreciation otherwise allocated for such year to the Capital Account of each Non-Managing Member who became a Non-Managing Member on or after July 1, 2007 over (ii) any balance remaining in such Non-Managing Member's Loss Recovery Account as of the beginning of such year will be allocated to the Managing Member's Capital Account ('Incentive Allocation')."  Further, it provided that "[a]s compensation for its services rendered to the Fund, the Fund will pay the Managing Member, in arrears with respect to each Non-Managing Member, each month, a fee ("Management Fee") equal to 1/12 of 0.90%," or for the High Yield and Equity Funds 1/12 of 1.3%, "of the Non-Managing Member's Capital Account balance on the last Business Day of that month, prior to any reduction for accrued Incentive Allocations."

**20.**

**Calculation of Fees.**

These fees were paid based on the value of the assets reported to investors, which

motivated Walter to keep the reported value of the assets as high as possible. The Core Fixed Income 2008 Audited Financial Statement, for example, explained that the manager received "a management fee calculated and payable monthly in arrears equal to 0.0750% (0.9% per annum) of non-managing members' equity." And, the Core Fixed Income Private Placement Memorandum stated, "[t]o calculate the Incentive Allocation, a 'Loss Recovery Account will be established for each Non-Managing Member with respect to whom an Incentive Allocation applies, the opening balance of which will be zero. As of the last Business Day of each calendar year, the balance of each Non-Member's Loss Recovery Account will be increased by any Net Capital Depreciation, or reduced by any Net Capital Appreciation for such year. The balance of a Non-Managing Member's Loss Recovery Account will not be reduced below zero."

**21.**

**Walter did not forthrightly disclose the significant difference
in management fees between the individual accounts and the pooled Funds.**

This upside compensation arrangement where in addition to management fees the fund manager gets a percentage of gains was unusual in the fixed income mutual fund world. Walter nevertheless did not mention it in the Q&A documents he used to sell the clients on a conversion to this structure. In fact, in forming these Funds and recommending them to his advisory customers, Walter omitted the major differences in his potential compensation (the upside fee). The upside fee incentivized risk-taking, including encouraging a leveraged strategy that was not appropriate for retirees who were looking for a safe, fixed income return.

**Walter Invested in MBS.**

16

**22.**

**Mortgage Backed Securities ("MBS").**

MBS are a form of debt securities that entitle the holders of the security to receive payments that depend on the cash flow from a pool of real estate mortgages.  MBS, particularly subprime MBS, bear various risks, including credit risks, liquidity risks, market risks, operations risk, structural risk, and legal risks.  In 2007, as the United States housing market experienced a significant downturn, and default rates climbed, the prices of MBS in general declined substantially.

**23.**

**Walter bought MBS from Cantor**.

Walter bought many MBS for the Pooled Funds, many of them from Cantor. The Funds had accounts at Cantor and received monthly statements from Cantor.  It is important to remember that the Funds were Cantor's direct customers, meaning that Cantor owed the Funds the basic obligations that all brokers owe their customers, including the duty to perform all functions with "commercial honor and just principles of trade" and in accordance with the duties imposed by the "know your customer" rule and that such duties were also owed to the plaintiffs as beneficiaries of the Funds..  Moreover, Cantor suggested specific bonds as in line with Commonwealth's approach.

**24.**

**Walter borrowed money from Cantor and other lenders**.

Walter, on behalf of the Funds, borrowed from Cantor and other lenders to buy MBS.  Cantor was at various times the Funds' chief margin lender.  The Funds borrowed from Cantor pursuant to a Repurchase Agreement ("Master Repo") entered into by the parties on March 28, 2007, which demonstrates that the borrowing began long

17

before the Collybus CDO transaction.  As Commonwealth described in the Statement of Claim it filed with FINRA, described below, in a repurchase financing transaction, "a seller—in this case Commonwealth—sells a security to a buyer—Cantor—for a given amount while simultaneously promising to repurchase the security at a future date.  In exchange for these securities, the seller—Commonwealth—receives cash proceeds on which it must pay interest."  The benefits—if the price of the security goes up—and the risk—if the price goes down—typically remain with the seller.  The Statement of Claim further explains that "if the price goes down while the buyer holds the security as collateral, the seller may be required to provide extra collateral in order to support its margin obligations to the buyer."  As the Funds' lender, Cantor had an indirect interest in the MBS, as Cantor, in effect, bore the risk if the Funds' equity dissipated.  This risk was reported regularly to regulators and to Cantor's members.

## 25.

**By June 2007, the Funds' holdings were made up of predominantly MBS.**

For example, about 70% of the High Yield Fund's assets were MBS and approximately 90% of the Core Fixed Fund's assets were MBS.

## 26.

**The MBS declined in value**.

In 2007, many MBS issues were downgraded by the ratings agencies and the market prices of the Funds' MBS broadly declined.  Significant price declines were evident by June of 2007 and were very pronounced in November of 2007 when the Collybus CDO was issued.  A preliminary review of the individual MBS in the portfolio suggests that, in June 2007, the Funds' overall MBS portfolio had declined by approximately 10 cents per dollar of face value.  By the end of July 2007, when Cantor

18

and Commonwealth were negotiating the terms of Collybus, the portfolio's value had declined by a total of approximately 20 cents per dollar. By November, when the Collybus CDO was formed, the Funds' overall MBS portfolio had declined by a total of approximately 47 cents per dollar of face value. Thus, from the time that Cantor and Commonwealth began to devise the creation of Collybus to the time of the CDO's issuance, the Funds' portfolio had declined by at least 35 cents per dollar. Walter kept this drop in price secret because if he hadn't, Commonwealth would have been forced to liquidate these declining MBS to fund redemptions; instead, Commonwealth and Morales held on to these MBS because they intended to deceive their investors and regulators regarding the precipitous decline in their value. For example, instead of informing the investors that their fixed income portfolios had declined significantly, Morales, with the assistance of Cantor, continued to value the assets at or above their purchase price each month, which allowed him to avoid redemptions and solicit new investments into the Funds, including new investments solicited from the Firefighters in the summer of 2008 without reference to Collybus and using an inflated NAV. The CDO was formed to further this scheme.

## 27.

### Walter received margin calls.

In the summer of 2007, the Funds' repo lenders, including Cantor, did not want to continue to extend loans with Walter's downgraded MBS as collateral. They threatened that they would not roll repo loans and were continuously demanding additional unimpaired collateral. Eventually, Cantor pulled all of its financing. During this time, Commonwealth faced liquidity problems and had difficulty meeting margin calls. Walter did not disclose this important fact to the investors, but instead continued to work with

Cantor to form the CDO and keep his extensive losses secret.

**28.**

**Walter did not report market declines**.

Although he knew that the MBS he owned were trading (when they traded) sharply lower than the values he was using to prepare the inventors' statements for the pooled Funds, Walter did not report the lower market values on the investor statements because his fees were based on net asset value, so lower values meant lower fees for him.  Also, he knew investors would besiege his Funds with redemption requests if they knew that their holdings had lost substantial market value.  This, in turn, would have spelled disaster for Walter's reputation and, likely, his career.

**29.**

**Industry practice was to get quotes from dealers to determine the value of MBS.**

In hedge funds that bought and sold MBS, it was industry practice that the Fund would seek multiple price quotes from dealers who regularly traded in similar securities. Funds used these quotes to compile values for the bonds that determined the monthly net asset values that were reported to Fund investors.

**30.**

**Walter represented that the Funds followed this practice.**

In the Funds' 2007 annual audited financial statements (distributed in June 2008), Walter represented that the Funds' NAV was calculated based on market quotations when available or valued at fair value when no market quotation was available.  Specifically, the audited financial statements described the 2007 valuation method as follows:

> The Fund's investments in securities, particularly asset-backed securities, corporate bonds and government agencies, are exchange-traded market

20

quotations or are readily available from third party market makers. Securities that are valued based on exchange prices will generally be valued at the last sale price on the exchange prior to valuation. Securities for which market quotations are not readily available are valued at fair value as determined by the investment Manager. Asset-backed securities are subject to credit risks associated with the performance of the underlying assets. The Fund uses broker quoted prices to value its securities, if available, and determined to be representative of fair value. The current market instability has made it more difficult to obtain market quotations on many of the Fund's securities. In situations where there are limited or no broker quoted prices, valuation of the Fund's securities are based on quotes provided by soliciting representative prices from more than one financial institution or pricing service that typically provide valuation of assets of a type substantially similar to the financial instruments being valued and the inputs that are unobservable in the market and significant to the overall fair value measurement.

**31.**

**Walter did not follow this market practice.**

Despite these representations, Walter did not attempt to obtain representative quotes from dealers during this time; instead, he knowingly used inflated, self-generated values to calculate the Funds' NAV. From early 2007 on, in a period where Walter was receiving margin calls based on deteriorating asset values, Walter did not show declines in NAV that reflected the very significant declines in the prices for the underlying securities. *See infra* (NAV Chart). These declines would have been reflected had he obtained multiple price quotes from dealers who regularly traded in similar securities, which Walter informed investors he was doing in the 2007 annual audited financial statements. Specifically, the Core Fixed Income 2007 Audited Financial Statement explained that, because of current market instability, the valuations for its MBS were obtained by "soliciting representative prices from more than one financial institution or pricing service . . . ." In fact, Walter was intentionally overstating the market value of the MBS in his portfolio throughout 2007 and early 2008.

21

**Walter and Cantor form the Collybus CDO.**

**32.**

**Walter wanted to re-securitize his MBS into a CDO**.

In the summer of 2007, Cantor and Walter began discussing the idea of re-securitizing the Funds' troubled MBS into a newly-formed cash-flow CDO to be managed by Commonwealth.  CDOs are secured by pools of asset-backed securities, such as MBS.  The income stream that cash-flow CDOs offer to investors is generated by the portfolio of underlying assets and is paid to investors in the order of the seniority of the tranche they hold.  The risk associated with a CDO investment depends on the seniority of the purchased tranche.  As the Collybus Offering Circular described:

> [o]ften Asset-Backed Securities are structured to reallocate the risks entailed in the underlying collateral (particularly credit risk) into security tranches that match the desires of investors.  For example, senior subordinated security structures give holders of senior tranches greater credit risk protection (albeit at lower yields) than holders of subordinated tranches. Under this structure, at least two classes of Asset-Backed Securities are issued, with the senior class having a priority claim on the cash flows from the underlying pool of assets. The subordinated class must absorb credit losses on the collateral before losses can be charged to the senior portion. Because the senior class has this priority claim, cash flows from the underlying pool of assets must first satisfy the requirements of the senior class. Only after these requirements have been met will the cash flows be directed to service the subordinated class.

**33.**

**CDOs were and remain generally unsuitable for most conservative investors.**

Because of their complex structure, time horizon, and liquidity and volatility risks, the SEC and FINRA have concluded that CDOs are generally not appropriate investments for seniors, retirees, and other conservative investors.  *See* FINRA Regulatory Notice 07-43 ("[C]ertain products pose risks that may be unsuitable for many seniors, . . . particularly those that involve . . . complex structured product, such as

collateralized debt obligations (CDOs)."); SEC Press Release 2009-260 (Selling complex mortgage derivative securities "to retirees and conservative investors was profoundly and egregiously wrong.").   Cantor knew that the ultimate beneficiaries of (or parties who would be injured by) the Funds' purchase of CDO tranches were the investors in the Funds.

**34.**

**The Motivation of Walter and Cantor.**

In the summer and fall of 2007, both Cantor and Walter had a similar problem. They owned MBS that had declined very significantly in price.  If Cantor were to have reported the market prices of its MBS, the lower values would have impaired its capital position and perhaps triggered a panic that would have affected its business and dictated a need to raise additional capital at an inopportune time.  If Walter had reported market prices to the investors, his management fees would have been greatly reduced and he would have faced redemption requests from Fund investors and lost a large portion of his client base.  He also would have been unable to continue to tout his above-market returns in his efforts to solicit Pension Funds and other new investors.   All of this was detrimental to his income stream.  But if Cantor and Walter were to convert the MBS they owned into CDO tranches, they could avoid reporting the losses because they could effectively value the tranches at whatever price they wanted to.  The potential benefits of such a transaction were even greater for Cantor than they were for Walter because, as discussed below, it was to receive the highest-rated senior tranches which had the greatest likelihood of paying out. At the time the CDO was issued, Cantor and Walter, however, knew that the CDO tranches would not be sellable and that the tranches, even the seniormost tranche, would likely remain illiquid.

23

437637v.6

**35.**

**By November 2007, the market for CDOs had "shut down."**

Cantor and Commonwealth knew that there would be no third party market for the CDO they were about to create.  In fact, Cantor's CEO publically had acknowledged that the CDO markets were "shut down" right before the CDO was issued on November 5, 2007.[1]  The timing of this CDO was extremely unusual; other firms were not issuing CDOs in this period.   In the end, Cantor and Commonwealth were not primarily concerned about the liquidity of the CDO tranches.    The CDO Cantor and Commonwealth were putting together was not intended to be sold; rather, the main purpose of forming the CDO was to manipulate asset values to make the balance sheets of the Funds and Cantor look better.  This was done at the expense of Walter's investors whose Funds would receive the worthless junior tranches, which were never expected to receive any principal and interest payments.

**36.**

**Overview of Collybus.**

After negotiating the terms of the CDO from August to November 2007, the Collybus CDO was born.  Walter was to put the Funds' MBS into the CDO, both through the Funds and through Stone & Youngberg LLC, a lender to the Funds; Cantor was to put its own inventory of MBS in the CDO, and a third party, Waterfall, was to put its inventory of MBS in the CDO.  Cantor and Waterfall also were to contribute net cash.  In return for transferring the MBS and cash, the Funds were to obtain the C, D, and E tranches (the lowest rated and riskiest tranches) of the CDO and be paid $100 million.

---

[1] http://www.reuters.com/article/video/idUSN0526735020071105?videoId=70209.

**37.**

**Waterfall may have been Cantor's Client.**

Cantor insisted that Waterfall be allowed to contribute its MBS to the CDO and Waterfall received mostly relatively senior tranches in exchange for the motley array of assets it contributed (mostly 2005 and 2006 vintage subprime and Alt-A loans, which, collectively, were the worst performing MBS contributed by any of the parties whose assets were used to form the Collybus CDO).  Cantor had undisclosed business relationships with Waterfall, including as a dealer and a lender, that caused Cantor to push to allow Waterfall to dump its MBS into the CDO and receive in exchange senior tranches of the CDO.  This action, which included the deliberate omission of material information known to Cantor, caused considerable loss to Commonwealth's investors.

**38.**

**The CDO came together**.

Walter and Cantor negotiated the terms of the CDO extensively. Ultimately, the pooled Funds (together with a Commonwealth proxy, Stone & Youngberg) contributed approximately $260 million of its MBS and received in return approximately $100 million in cash and the C ($35 million), D ($44 million) and E ($51 million) tranches of the CDO (a total of $230 million).  The C, D, and E tranches were the most subordinate tranches and would be the first to experience problems if the underlying loans went bad. Cantor, in contrast, got the A tranches (A-1, $30 million, A-2, $630,500,000 and A-3, $10,200,000) and the B tranche ($5,750,000) for the $605 million of MBS and $42 million cash it contributed to the CDO (a total of $677,450,000 received for $647,000,000 contributed).  The A and B tranches were the most senior tranches and entitled Cantor to received payment in preference and priority over the tranches owned

by the Funds.

### 39.

**Tranche seniority dictated payment priority, duration, and interest rate.**

The Collybus-issued notes and the seniority of the note's tranche dictated the payment priority. The "A" tranches were to receive all interest due to it before the "B" tranche received any. And the principal of the "A" tranches was to be repaid before any of the "B" tranche's principal was repaid, the "B" tranche's principal would be paid before "C," "C" before "D," and "D" before the remaining equity portion was paid. So Collybus' senior tranches had shorter duration than junior tranches because senior tranches were repaid first. Holders of "C," "D," and equity tranches received higher rates of interest than the holders of senior tranches but were last in line to receive their first dollar. This interest was their (albeit illusory) compensation for greater risk and longer duration.

### 40.

The Collybus CDO had the following face value:

U.S. $90,000,000 Class A-I Senior Secured Floating Rate Notes due 2047

U.S. $675,000,000 Class A-2 Senior Secured Floating Rate Notes due 2047

U.S. $55,000,000 Class A-3 Senior Secured Floating Rate Notes due 2047

U.S. $53,000,000 Class B Senior Secured Floating Rate Notes due 2047

U.S. $35,000,000 Class C Deferrable Senior Secured Floating Rate Notes due 2047

U.S. $44,000,000 Class D Deferrable Senior Secured Floating Rate Notes due 2047

U.S. $60,583,157.67 Subordinate Securities

### 41.

**Securities were contributed.**

26

The parties contributed securities with principal balances as follows:

| | |
|---|---|
| Cantor | $604,477,022.09 |
| Waterfall | $187,837,726.51 |
| Niagra (a Waterfall proxy) | $37,708,268.48 |
| Sand Spring Capital LLC | $68,034,372.38 |
| Sand Spring Capital Ltd | $21,150,254.28 |
| Sand Spring Capital II, LLC | $13,098,415 |
| CA Core Fixed Income Fund LLC | $44,269,169.15 |
| CA Core Fixed Income Fund Ltd | $19,944,054.33 |
| CA High Yield Fund LLC | $5,184,848.06 |
| CA High Yield Fund Ltd | $13,255,196.28 |
| Stone and Youngberg (a Commonwealth proxy) | $78,187,392.08 |
| Total | $1,093,107,719.52 |

**42.**

**The CDO issued securities.**

The parties received securities issued by Collybus as follows:

Cantor:

$30,000,000 (A-1)

$630,500,000 (A-2)

$10,200,000(A-3)

$5,750,000 (B)


Waterfall:

$60,000,000 (A-1)

$44,500,000 (A-2)

$44,800,000 (A-3)

$47,250,000 (B)

$9,612,186 (E)


Commonwealth:

$35,000,000 (C)

$44,000,000 (D)

$50,970,971 (E)


Total                    $1,012,583,158

### 43.

### Cantor put in cash.

The following parties put cash into the deal as follows:

Cantor        $42,641,615

Waterfall     $57,358,389

### 44.

### Commonwealth received cash.

Commonwealth got $100,000,004 in cash.

### 45.

### Distribution of the tranches received by the Commonwealth Funds.

| Tranche C | |
|---|---|
| Sand Spring Capital LLC | 2,889,000.00 |

| | |
|---|---|
| Sand Spring Capital LTD | 2,574,000.00 |
| Sand Spring Capital II LLC | 2,817,000.00 |
| CA Core Fixed Income Fund, LLC | 13,494,000.00 |
| CA Core Fixed Income Fund, Ltd. | 6,994,000.00 |
| CA High Yield Fund LLC | 1,755,000.00 |
| CA High Yield Fund Ltd. | 4,477,000.00 |
| **Tranche D** | |
| Sand Spring Capital LLC | 4,740,000.00 |
| Sand Spring Capital LTD | 4,234,000.00 |
| Sand Spring Capital II LLC | 4,631,000.00 |
| CA Core Fixed Income Fund, LLC | 22,273,000.00 |
| CA Core Fixed Income Fund, Ltd. | 4,270,000.00 |
| CA High Yield Fund LLC | 1,100,000.00 |
| CA High Yield Fund Ltd. | 2,752,000.00 |
| **Tranche E** | |
| Sand Spring Capital III | 50,970,971.40 |

**46.**

**Cantor's personnel and computer programs determined pricing of the CDOs' assets.**

Cantor ran valuation scenarios and otherwise priced both the MBS that went into the CDO and the tranches of the CDO. Cantor used its intex software and other programs to determine the values of the underlying MBS and the tranches of the CDOs. Commonwealth claims to have relied on this analysis and Cantor's advice in entering into

29

the CDO transaction and in particular evaluating the likelihood that the C, D, and E tranches would pay or would stop paying and when this might occur. On information and belief, important parts of the data Cantor entered to produce the scenarios, probabilities, and valuations were wrong and made the scenarios look better for the C, D and E tranches. After the transaction, Cantor made corrections to the data files but the data errors had already prejudiced the Funds and the investors. Had Cantor supplied this correct information, the investors would not have suffered the large losses as the transaction would have been structured and priced differently. Cantor's incorrect analysis made what was a bad transaction considerably worse for the Funds and the investors.

### Cantor's and Collybus' Motivations for Forming Collybus-I.

### 47.

### Why restructure the MBS portfolio.

The typical motivation for restructuring a portfolio of MBS into a CDO was that the restructure would convert lower-rated, lower-valued MBS into AAA-rated, readily marketable securities that could be sold to third parties. As an example, one might take 100 separate MBS securities, with a face value of a billion dollars, with ratings varying from AAA down to unrated and pool them into a CDO. Many of the MBS would not be marketable or would be selling at big discounts to par. The CDO would issue a series of notes which would be supported by the MBS pool. The senior notes, the "A" tranche, might be issued with a face amount of $800 million and would typically be rated AAA. The subordinate tranches would be issued in smaller face amounts and would have lower credit ratings. There would likely be an unrated equity tranche at the very bottom end of

437637v.6

the payment waterfall.  So, for example, the CDO might issue "B" notes rated AA for $60 million, "C" notes rated A for $40 million, "D" notes rated BBB for $40 million and an unrated equity tranche of $60 million.  The AAA securities would be easily marketable at par and, generally when the market was working, so would the higher-interest-rate subordinate tranches.  The equity piece, however, would typically be retained by the issuer.  But by the time the Collybus CDO was issued, the market for even senior tranches of CDOs had completely dried up.  Neither Cantor nor Walter would be able to sell the tranches they received at any price near par value, a fact they knew going into the closing.

## 48.

## Alternatives to the CDO.

At the time the transaction was being planned, Walter could have just sold the MBS in the market.  This is what would likely have happened had he kept the investors informed about the value of these securities.   Had the investors known they were suffering large losses, they would have expressed alarm and tried to redeem their investments.  Had they known they were at risk of forced sale because of margin calls, they would have tried to withdraw their funds and they would have been alarmed by the CDO strategy the Funds pursued.  If Walter had just sold the offending MBS in June through August 2007, the investors' losses would have been minimal.  Instead of selling the MBS, Cantor and Walter schemed to allow Walter to contribute his MBS into the CDO to help avoid disclosure of the extent of these losses and to give him time to recover his losses by doubling his bets on MBS.  As Cantor dragged out the negotiations until November 2007, the losses mounted.  The problem was that if Walter sold the MBS, he would have had to report this loss to his investors, which would have spelled the demise

31

of his Funds and, probably, his career.  So, he held the MBS until he could convert them into CDO tranches.  By taking the C, D, and E tranches as partial consideration, and pretending that they were worth about par, he avoided reporting the losses.  The losses, however, were embedded in the CDO tranches and were quickly realized.

**49.**

**Cantor and Commonwealth failed to disclose substantial declines**

**in the value of their assets.**

The CDO tranches, because they did not trade, did not have a price that could be derived based on recent sales, so the Funds could report the values of the CDO tranches based on Walter's independent, self-interested calculations. This CDO valuation protocol meant protection of high management fees to Walter, because he could report higher net asset values than if the underlying assets were MBS that could be marked to market based on recent MBS transactions.  Specifically, Commonwealth's method of valuation for CDOs, as reported in its 2008 audited financial statement (prepared on April 9, 2009 and distributed shortly after that), provided that CDOs were classified as "Level 3" instruments.  As Level 3 instruments, valuations were "based on inputs that [we]re unobservable and significant to the overall fair value measurement. . . . To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment."  Cantor also benefited from this arrangement, as it was able to avoid reporting its own MBS' losses and avoided an embarrassing and potentially damaging write down of its own assets. In sum, the CDO was a form of financial alchemy that allowed Walter to preserve his income stream and protected him from investor panic due to the poor investment results he was experiencing.

**50.**

**Commonwealth received cash.**

When the transaction closed, the Funds received $100 million cash, which turned out, after the events described below, to be the only value it received for about $260 million in face value of MBS securities that the Funds contributed to the CDO.  But, even this apparent benefit was illusory.  First, the $100 million was not a fair valuation of the value of the MBS contributed by the CA Funds.  Although the Funds also received tranches in the CDO, Walter and Commonwealth knew that the equity tranche was probably worthless even before the CDO was formed and that the C and D tranches were worth far less than their face values.  Second, Walter had already decided that he would use the $100 million to buy more CDO tranches, specifically setting his sights on the A-2 tranche.    Indeed, almost immediately after the closing of Collybus, Cantor and Commonwealth began discussions regarding the sale of the A-2 tranche to the Funds.  Walter eventually purchased the A-2 tranche of the Collybus CDO, as discussed below.

**51.**

**Walter earned fees as Collateral Manager**.

A major reason Walter wanted to form the CDO was that Walter would be paid a 6 basis point Collateral Manager fee on all of the CDO's assets.  Although it is not clear that Walter took overlapping Fund management fees and CDO Collateral Manager fees with respect to the assets he managed for the Funds, the Collateral Manager position substantially increased Walter's assets under management.  Even assuming Walter did not double-dip on the fees directly based on the assets of the Funds, the Funds' initial investment in the CDO was less than twenty-five percent (25%) of the principal amount of the CDO, upon which his Collateral Manager fees were based.  By forming the CDO

33

and holding the position of Collateral Manager, Walter put an additional $800,000,000-plus under his management (an income stream of at least an additional $500,000 per year to him). Walter actively bargained with Cantor to increase this Collateral Manager fee, and he threatened to pull the Funds' assets out of the CDO unless the fee to him was increased.  In a September 24, 2007 email from Walter Morales to Gina Hubbell, a Cantor employee who worked in structured products), Walter responded to Hubbell's proposal that Commonwealth share the Collateral Manager role and receive 2 out of 11 basis points: "This won't fly.  We are too much in a back seat with this.  I have all the equity no comp no headline.  I have been around 16 years what are these guys doing besides eating some AA.  I need to be solo or lead." Walter used Plaintiffs' assets as leverage to demand such a fee.  In return for capitulating to his fee, Walter caused the Funds to put their MBS in the CDO and take the most subordinate tranches of the CDO in return.   To plaintiffs' knowledge, no disinterested person with authority to act on behalf of the funds approved Walter's conduct in connection with the CDO.  Because the deal was a static one where Walter did not actively manage the assets by buying and selling assets on an ongoing basis, this fee amounted to a lot of money for little anticipated work.

### 52.

**Walter received a personal benefit at the expense of his customers.**

Although Walter was willing to fight for the Collateral Manager role and a larger fee, he did not put up the same fight with respect to the tranches received by the Funds. Under the deal initially contemplated by Walter in July 2007, the Funds would have retained A2, B2, and residual tranches.  Over time, of course, Walter gradually gave up the higher tranches without much of a fight.  These facts demonstrate the problem with

34

the transactions. Walter and Cantor were negotiating for their own self-interest, and there was no one looking after the investors. So Walter and Cantor illegally entered into transactions to benefit themselves to the detriment of the investors. Such a transaction, where a fiduciary/agent intentionally and obviously schemes with a third party to make money at the expense and detriment of innocent and trusting clients is illegal and against public policy.

**Commonwealth and Morales breached their fiduciary duties in forming Collybus, and Cantor knowingly participated in this breach.**

**53.**

**The CDO changed the Funds' risk and diversification, which in turn changed the investors' risk and diversification.**

When the transaction was concluded, the nature of the Funds' risk had changed significantly for the worse. Whereas previously the investors' Funds had owned a portfolio of MBS, having its own characteristics — a fairly diverse mix of senior and subordinate MBS — post-Collybus, the Funds owned the most subordinate tranches of a single CDO, which substantially increased the investors' Funds' exposure to deterioration of the MBS market and decreased the liquidity of the Funds' holdings. Essentially, Walter traded a senior position in a portfolio of MBS for a junior position in an illiquid CDO. Before the transaction, the Funds had been protected against a total loss by their first dollar position in the securities they owned, but now Walter had given this protection up entirely. As discussed below, this caused substantial damages to the plaintiffs.

**54.**

**Conflict of Interest**.

Morales' role as Collateral Manager—and his negotiation at the expense of the

Funds to get that position—presented a manifest conflict of interest for Walter. Cantor knew of the conflict and knew he was breaching fiduciary duties owed to the Funds and the investors and provided substantial assistance to him in this breach.

### 55.

### Failure to Disclose.

Walter did not explain the CDO transaction and its various implications to his Fund investors contemporaneously with planning or implementing it. He did not disclose his role as Collateral Manager or the conflict that this role presented. He did not disclose the significant leverage he was using. He did not explain that the MBS the Funds owned had lost nearly half their value. Instead, with Cantor's active help, he actively concealed this information from the investors, both before and after the transaction. Moreover, Walter solicited new investments, including from certain plaintiffs, without disclosing this information.

### 56.

### Cantor knew that Walter was a fiduciary to the Funds and their Investors.

Cantor was specifically aware that Walter was a fiduciary to the Funds and their investors. Cantor also knew that Walter was violating his fiduciary duties in entering the CDO transaction. Despite its knowledge, Cantor participated anyway. Cantor directly benefited from its participation by collecting significant fees and transforming its impaired MBS into AAA-rated CDO tranches. Cantor also indirectly benefited from the windfall that Waterfall received.

### 57.

### Cantor was aware of the investment objectives of the Funds and Walter's investor base.

36

The Collybus Offering Circular, for which Cantor was the placement agent, contained Commonwealth's Form ADV, which outlined the investment objectives of the Funds and Walter's compensation arrangements with the Funds. In addition, Cantor had previous sales relationships with Walter and the Funds.  As a result, Cantor knew many of the details of his advisory practice and the specific characteristics of the Funds and his investor base.

**Commonwealth Buys Even More of the CDO.**

**58.**

**The Funds were already highly concentrated in the CDO**.

At the end of 2007, for example, the Core Fixed Fund owned total assets of $104,686,646.00, which included $22,259,374.00 fair value of Collybus CDS Ltd. 9.16% 12/9/47 (the Class D Notes) and $13,494,000.00 fair value of Collybus CDO Ltd. 7.36% 12/9/47 (the Class C Notes), and the High Yield Fund owned  total assets of $17,313,437.12 which included $1,099,327.00 fair value of Collybus CDS Ltd. 9.16% 12/9/47 (the Class D Notes) and $1,099,327.08 fair value of Collybus CDO Ltd. 7.36% 12/9/47 (the Class C Notes).  The Funds had only minimal borrowings at the end of 2007, perhaps due to having paid off loans with the cash proceeds from Collybus.  The CA Equity Funds did not purchase Collybus notes as part of the November 2007 transaction.

**59.**

**The CDO tranches became impaired**.

In early 2008, it became apparent that the C, D, and E tranches of the CDO were not performing at all and were not expected to see a return of principal, much less interest.  As reported in the Funds' bankruptcy filing, "[b]y the end of the first quarter of 2008, Collybus had failed overcollateralization triggers with respect to the C and D

37

tranches, which caused all cash flow to be diverted to principal and interest on the more senior tranches, until such time as the coverage ratio recovered." In addition, by the end of March 2008, the value of the Core Fixed Fund's Collybus holdings had decreased from $22,259,374.00 to $17,616,438.00 (the Class D Notes) and $13,494,000.00 to $11,065,080.00 (the Class C Notes). And, by the end of May 2008, the value of the tranches had decreased further to $9,034,070.80 for the Class D Notes and $6,747,000.00 for the Class C Notes. The decrease in value for the E tranche was even more extreme. On May 29, 2008 (corrected on June 5, 2008), these tranches were downgraded by Moody's to a Baa3 for Class C and to Ca for Class D.

**Walter did not report these losses and manipulated the books to hide them.**

**60.**

Once the CDO was issued, Walter knew that the values of the C,D and E tranches were greatly impaired. By the spring of 2008, they had stopped paying. Nonetheless, he did not reflect the impaired values when reporting the NAV to investors on a monthly basis. In fact, these valuations continued to reflect a portfolio that was worth more than he paid for it, which was false.

**61.**

From time to time, Walter made interfund adjustments to benefit certain investors, particularly Crestline. For example, in the CDO transaction, the equity tranche, the most junior and subordinate tranche, was initially owned by a Sand Spring Fund. It quite quickly became clear that this tranche was valueless or nearly so. Nonetheless, Walter created an inter-fund transaction where various of Funds bought parts of this equity tranche for 102 cents on the dollar in March of 2008 – a patently fabricated sale price. Thus, the investors in the funds that bought this worthless security for 102 cents in

38

this dubious transaction suffered an immediate loss and the investors in the fund that sold this tranche enjoyed an immediate, unjustified gain.

**62.**

Indeed, most of the transactions made in this period, including the CDO transaction were designed to hide the dramatic losses the funds were suffering so Walter could retain his income stream. On information and belief, Cantor fully understood the implications of what Walter was doing and provided substantial aid to him in doing it.

**63.**

**Walter attempted to gamble his way out of trouble by buying more of the CDO.**

Walter wanted to invest what was left of the $100 million cash he had in more MBS. He was in a classic "double-up-to-make-up" mind set and wanted, in effect, to double down on MBS.  Cantor, meanwhile, had been unable to sell any of the tranches of the CDO that it owned and knew that Commonwealth had lost a substantial amount of money on the C, D, and E Tranches.  Cantor and Walter started to discuss the Funds' purchase of the A-2 tranche. Ultimately, Walter and Cantor agreed that Walter, on behalf of the Funds, would buy the entire $610,500,000 of the A-2 tranche for a total of approximately $444 million, of which approximately $300-plus million was borrowed using a repurchase agreement with Cantor.  This was a price of $72.75 per $100 par value and occurred in June of 2008, almost immediately after the A-2 tranche was downgraded from Aaa to A2 on May 29, 2008.

**64.**

**Buying more of the CDO increased risk.**

This transaction increased substantially the asset concentration and leverage of each of the Funds. Although Walter had consistently told investors that he intended to

39

pursue a diversified strategy and that leverage was not a significant component of the strategies he intended to employ, by July of 2008 he was highly leveraged and highly concentrated in the A-2 tranche in each of his Funds. There was no longer any meaningful distinction between the holdings of the different Funds; Walter had committed the investors' Funds to the A-2 tranche of the CDO.

**65.**

**Cantor knew that the A-2 transaction was inconsistent with the Funds'—and therefore the Plaintiffs'—investment objectives.**

Cantor was well aware that Walter was deviating substantially from the objectives of the investors' Funds when Cantor sold the A-2 tranche to him.  As previously alleged, Cantor had received Commonwealth's ADV explaining the investment objectives of the Funds.  Based on statements in the ADV, it was aware that the objective of the Fixed Income Funds was to provide investors with a return exceeding the Lehman Brothers Aggregate Bond Index through "investment in a diversified portfolio of fixed income securities, primarily investment grade."  And, Cantor was aware that the objective of the Equity Funds was to provide its investors with a return exceeding the Dow Jones Wilshire 5000 Composite Index "primarily through investment in a diversified portfolio of equity securities."  Of course, Cantor was aware that the A-2 tranche did not meet these Funds' investment criteria.  Moreover, Cantor was aware that all of the Funds were supposed to be diversified.  Cantor knew that after the Funds purchased the A-2 tranche, they would be extremely concentrated in the A-2 tranche.  Cantor knew this because it had received the financials for the Funds in advance of the A-2 tranche transaction. Cantor disregarded the obvious conflict of interest, and aided, abetted, participated in,

437637v.6

and assisted Morales' actions because Cantor wanted to get these assets off its books.

66.

**After the purchase, the Funds—and, through the Funds, the investors—were all concentrated in a leveraged bet on the CDO.**

At the end of 2008, Commonwealth's internal financial statements (which are likely overstating the true value of the Funds' assets) show that the Core Fixed Fund had $236,387,819 in total assets and $100,048,850 in net assets of which the A-2 tranche was $222,666,256 or 222.6% of the net assets. It had securities sold under agreement to repurchase in the amount of $136,064,443. The High Yield Fund had $24,828,441 in total assets and $13,718,154 in net assets of which the A-2 tranche was $17,485,822 or 127.5% of the net assets. It had securities sold under agreement to repurchase in the amount of $10,685,044.  The Equity Fund had $18,252,583 in total assets and $8,949,726 in net assets of which the A-2 tranche was $15,163,305 or 169.4% of the net assets. It had securities sold under agreement to repurchase in the amount of $9,265,825.   The fact that the "Equity" fund was invested in Collybus, in itself, demonstrates the lengths Cantor was willing to go to assist Walter in breaching his duties.   The CDO tranche was obviously not an equity investment.

67.

**Walter wrote up the A-2 tranche to offset the impairment of the other tranches.**

As discussed above, the monthly statements for the Funds continued to show fairly good performance and robust net asset values even after the C, D, and E tranches were very obviously impaired. This is because, until June of 2008, Walter calculated the NAV himself and he did not meaningfully reduce the stated values of the C, D and E tranches even when they stopped paying.  Once he bought the A-2 tranche, he

41

did write down the C, D, and E tranches, but the Funds' reported NAV still stayed fairly stable.  Walter was able to keep reporting the NAV as greater than $1,000 because when he reduced the value of those junior tranches on the Funds' books, he offset those losses with substantial purported gains on the A-2 tranche transaction. So even though there was no market value for the A-2 tranche (Walter said he was the only buyer who could come close to the price he offered) and he claimed to have purchased the A-2 tranche at a steep discount from Cantor (which obviously knew its value quite well), he marked the A-2 tranche up from 72.75 cents to 88 cents the same month he bought it.  On information and belief, he did so using information supplied by Cantor for this purpose.  As a result of this unjustifiable mark-up, the Funds' monthly statements continued to show solid investment performance and Walter continued to earn his large fees.

**68.**

**Walter's A-2 values were illogical**.

The values Walter used to calculate the Funds' NAV were in considerable contrast to the way he and Cantor had valued the A-2 tranche when they negotiated Cantor's loan.  For purposes of determining when posting of additional collateral was appropriate due to deterioration of value in the A-2 tranche, Cantor had required that he use the ABX index.  The ABX index was therefore used by the parties as a proxy for the A-2's value, but Walter used his own very different and unreasonably optimistic calculations for NAV purposes.  This meant that Fund investors saw monthly statements based on Walter's valuations that gave no hint that they were actually doing quite poorly. In reality, Cantor and Morales knew that the C, D, and E tranches were effectively valueless and the A-2 tranche was significantly impaired.

42

**69.**

**Reported NAV for Core Fixed Income are representative
of Walter's approach to reporting.**

The following chart reflects the NAV for the Core Fixed Income Fund as reported
by Walter.

| Valuation Date | Date Prepared | Closing NAV |
|---|---|---|
| Aug 31 2007 | Sep 21 2007 | $1,005.09 |
| Sep 30 2007 | Oct 25 2007 | $1,011.52 |
| Oct 31 2007 | Nov 27 2007 | $1,028.98 |
| Nov 30 2007 | Dec 19 2007 | $1,060.52 |
| Dec 31 2007 | Jan 11 2008 | $1,069.39 |
| Jan 31 2008 | Feb 15 2008 | $1,225.91 |
| Feb 29 2008 | Mar 19 2008 | $1,203.26 |
| Mar 31 2008 | Apr 15 2008 | $1,206.40 |
| Apr 30 2008 | May 16 2008 | $1,198.46 |
| May 31 2008 | Jun 11 2008 | $1,197.83 |
| Jun 30 2008 | Jul 30 2008 | $1,148.33 |
| Jul 31 2008 | Oct 7 2008 | $995.21 |
| Aug 31 2008 | Oct 10 2008 | $999.34 |
| Sep 30 2008 | Oct 29 2008 | $1,013.54 |
| Oct 31 2008 | Nov 20 2008 | $1,008.71 |
| Nov 30 2008 | Dec 23 2008 | $794.34 |

437637v.6

| | | |
|---|---|---|
| Dec 31 2008 | Jan 26 2009 | $815.35 |
| Jan 31 2009 | Feb 28 2009 | $832.62 |
| Feb 28 2009 | Mar 18 2009 | $794.19 |
| Mar 31 2009 | Apr 15 2009 | $826.28 |
| Apr 30 2009 | May 12 2009 | $828.18 |
| May 31 2009 | Jun 9 2009 | $806.84 |
| Jun 30 2009 | Jul 14 2009 | $809.63 |
| Jul 31 2009 | Aug 13 2009 | $839.46 |
| Aug 31 2009 | Sep 21 2009 | $822.09 |
| Sep 30 2009 | Oct 14 2009 | $846.68 |
| Oct 31 2009 | Nov 17 2009 | $848.12 |
| Nov 30 2009 | Dec 15 2009 | $849.09 |
| Dec 31, 2009 | Feb 1, 2010 | $425.07 |
| Jan 31, 2010 | Feb 10, 2010 | $425.73 |
| Feb 28, 2010 | Mar 10, 2010 | $422.58 |
| Mar 31, 2010 | Apr 22, 2010 | $392.68 |
| Apr 30, 2010 | May 19, 2010 | $369.27 |
| May 31, 2010 | Jun 10, 2010 | $370.08 |
| Jun 30, 2010 | Jul 15, 2010 | $380.08 |
| Jul 31, 2010 | Aug 9, 2010 | $381.82 |
| Sep 30, 2010 | Oct 22, 2010 | $383.01 |
| Oct 31, 2010 | Nov 11, 2010 | $384.87 |

437637v.6

Note that the NAV in the period from August 30, 2007 through June 30, 2008 stayed above $1000 which was the Fund's par value.  The values were not marked down even as the MBS market were declining substantially, the CDO was formed, the C and D tranches stopped paying interest, and the A-2 tranche had traded for 72 cents on the dollar.  In fact, they were not marked down to reflect anything approximating a real value until 2010.

**70.**

**Walter had incentive to set the NAV high.**

Walter had an incentive to want the MBS market values high.  Because his monthly compensation was a percentage of the Funds' net asset value, higher was better for him.  In addition, if the NAV was kept high, his reported performance looked better, which helped attract new investors and reassure existing ones.  Cantor was complicit in this artifice as well, as at least from mid-2008 and on Cantor provided the "quotes" that supported these overstated values.

**71.**

**Walter received a margin call**.

In November and December 2008, Walter received a margin call from Cantor demanding that Walter post significant additional capital based on a precipitous decline in the ABX index.  But Walter had no additional capital to post.  Even then, he did not tell the investors that he was concentrated in the A-2 tranche, that he was highly leveraged, that there was a clear and present danger that the Funds' assets could be forcibly liquidated, and that the investors stood to lose most or all of their money.  *See* NAV Chart.

**72.**

**Walter filed an arbitration**.

Walter was forced to file an arbitration and ultimately an injunctive action to stop Cantor from liquidating the A-2 tranche. Walter did not inform the investors of this alarming development.  Though he was able to settle the injunction and arbitration cases against Cantor without his portfolio being forcibly liquidated, the investors remained ignorant to the precarious financial condition of the funds that had been caused by Walter's conduct.

**73.**

**The Indemnification and Release do not cover the conduct alleged by Plaintiffs.**

In connection with the arbitration, Walter entered into a settlement with Cantor that purportedly released Cantor from all liability and indemnified Cantor, another event about which the investors were not told.  The Indemnification and Release provisions in the Settlement Agreement do not release or indemnify Cantor from liability for its acts giving rise to the present suit, because the provisions were executed in connection with a settlement of Commonwealth's claims related to Cantor's attempts to liquidate certain of the Funds' assets to satisfy loan obligations.  Those claims do not relate to the claims by plaintiffs, which involve Cantor's conduct in aiding and abetting Morales's breach of his fiduciary duty to the investors by structuring the CDO to benefit himself and Cantor at the expense of investors.  Moreover, there was no consideration given as compensation for Cantor's participation in Morales' breach of fiduciary duty and willful self-dealing. In sum, based on its terms and the context of its execution, the settlement and its the indemnity and release obligations do not reach the wrongful conduct alleged in this case.

**74.**

**The release and indemnification were not authorized.**

The release and indemnification were signed without the approval of any disinterested person, acting on behalf of the funds, who (1) had been informed of the misconduct by Morales and Cantor, and (2) approved the release with knowledge of those facts.

**75.**

**The Indemnification and Release are unenforceable.**

Cantor and Commonwealth, as co-conspirators, cannot release or indemnify each other from liability for their conspiracy.  Walter's actions, substantially assisted by Cantor, damaged the Funds and the investors who were not provided information sufficient to apprise them of the wrongdoing.  Walter, on behalf of the Funds and investors who were damaged, cannot release its co-wrongdoer in an action that has nothing to do with that wrongdoing.  And, Walter, as a fiduciary, cannot release claims or indemnify parties without disclosing material facts relevant to that release or indemnification to his principals.  Walter did not disclose material facts here, rendering the indemnification and release void.

**76.**

**Walter lowered the net asset values.**

In December 2009, Walter finally lowered the reported net asset value substantially.  For example, the Core Fixed Income's NAV was lowered from $849 in November 2009 to $425 in December 2009.  *See* NAV Chart.  The most recent reported

47

NAV for the Core Fixed Fund was $348.  The other Funds suffered similar declines and similar belated reporting.   The Funds' NAVs continue to decline to date.  Still, plaintiffs believe that the actual values of their Funds are much lower than what is presently being reported given the Fund's concentration in the Collybus A-2 tranche.

**77.**

**Wells Notice.**

Commonwealth and two of its representatives, including Walter, have received Wells Notices from regulators due to allegations of fraud on their part in connection with the facts set forth above.

## CLAIMS FOR RELIEF

**78.**

To the extent not previously alleged, the defendants, Cantor Fitzgerald & Co., and its officers, employees, and control persons, Commonwealth Advisors, Inc., and its officers, employees and control persons, and Walter A. Morales III, are liable to the plaintiffs for violating Louisiana law, and where applicable, Delaware and/or New York law.  Any or all of the violations of the law render the defendants liable *in solido* to the plaintiffs for general and special damages, rescission of the sale of securities and return of the purchase price, interest from the sale date until paid, all other recoverable damages, all recoverable costs and all recoverable attorney's fees.

**79.**

Each of the allegations made in this complaint are incorporated in the following claims of relief by reference and will not be re-alleged.

437637v.6

**80.**

Although previously alleged with particularity, the wrongdoings of the defendants may be summarized as, but are not necessarily limited to, the following violations of Louisiana law and, where applicable, the laws of Delaware and/or New York. Commonwealth is formed under the laws of Louisiana; Walter and almost all plaintiffs reside and are domiciled in Louisiana; a substantial portion of the acts giving rise to these claims occurred in Louisiana; and the majority of the damages occurred in Louisiana. Collybus and several of the Funds are organized under the laws of Delaware, and Delaware law purportedly governs the interpretation of the plaintiffs' subscription agreements. Cantor is organized under the laws of New York, and New York law purportedly governs the Collybus notes.

## FIRST CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, AND CONSPIRACY TO BREACH THAT FIDUCIARY DUTY

**81.**

Under Louisiana, Delaware and New York law, a plaintiff may bring a claim for breach of fiduciary duty when (1) a fiduciary relationship exists between the plaintiff and the defendant; (2) the defendant breaches his fiduciary duty; and (3) the plaintiff suffers damages as a result of the breach.

**82.**

Morales and Commonwealth were fiduciaries to each of the plaintiffs and owed all the duties commensurate with this position.

**83.**

Under Louisiana, Delaware and New York law, a fiduciary relationship exists when a person imposes special confidence or trust in another, who is to act primarily for

49

the benefit of the principal in a particular endeavor, or when one person owes a special duty to another to protect his or her interests. Among other things, the fiduciary relationship contemplates one person placing his or her faith, confidence and trust in, and relying on the judgment and advice of, another. For example, a fiduciary relationship exists when the business that the fiduciary transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other. The person, firm, partnership, association or corporation, who or which occupies this position of peculiar confidence toward another is known as the fiduciary.

## 84.

A fiduciary relationship existed between each of the plaintiffs on the one hand and Morales and Commonwealth on the other. Morales and Commonwealth were financial professionals who willingly accepted responsibility for investing and safeguarding each of the plaintiff's investments for the benefit of each plaintiff. Commonwealth was a registered investment adviser, and Morales, in fact, acted as a trusted advisor to each account owned by each plaintiff. Each of the plaintiffs placed his or her faith, confidence, and trust in Morales and Commonwealth, and relied on their judgment and advice, in investing, maintaining and safeguarding each plaintiff's investments. Commonwealth and Morales' furnishing of investment advice on a fee basis, learning the personal and intimate details of the financial affairs of each of the plaintiffs, and making recommendations as to purchases and sales of securities, cultivated a confidential and intimate relationship and imposed upon Commonwealth and Morales a duty to act in the best interests of their clients and to make only such recommendations

50

that best serves each plaintiff's interest.

**85.**

As fiduciaries, Commonwealth and Morales were prohibited from self-dealing and benefitting personally from a transaction affecting any plaintiff in the absence of the plaintiff's consent after full disclosure.  Commonwealth and Morales owed a duty to render full and fair disclosure to each plaintiff of all facts which materially affected his or her rights and interests and to take reasonable steps to avoid misleading each of the plaintiffs.  And Commonwealth and Cantor had a duty to give prudent investment advice to the plaintiffs based upon the suitability of the investment in light of each investor's investment objectives and to act prudently and in their client's best interest when advising their clients.  This duty encompassed a responsibility to diversify the clients' investments to protect against the possibility of large losses unless it was clearly prudent not to do so.

**86.**

Commonwealth and Morales also were fiduciaries to the Pension Funds under La. R.S. 11:264 because they exercised discretionary authority and control over the management of the Pension Funds' investments and/or rendered investment advice and services for compensation, direct or indirect, with respect to system Funds or assets. Consequently, Commonwealth and Morales were required to discharge these duties with respect to the system in the exclusive interest of the members and beneficiaries and/or solely in the interest of system members and beneficiaries for the exclusive purpose of providing benefits to participants and beneficiaries and paying the expenses of administering the plan.

437637v.6

**87.**

Additionally, Cantor was a fiduciary to the Pension Funds under La. R.S. 11:264 because it indirectly provided investment advice or services to the Pension Funds for compensation by coordinating the creation and the structure of the Collybus CDO by recommending the purchase of particular securities to the Funds and by buying, selling, and loaning securities and money to the Funds (and, through the Funds, to the Pension Funds).

**88.**

Acting as investment advisor to, and money manager of, each of the plaintiffs named in this complaint, Commonwealth and Morales breached their fiduciary duties owed to each plaintiff by (1) deviating from each plaintiff's investment strategies without obtaining the plaintiff's consent; (2) not disclosing facts that would have informed each plaintiff of the change in investment strategy; (3) making inherently unsuitable investments in violation of its duty of prudence; (4) failing to diversify each plaintiffs' investments; (5) failing to disclose this lack of diversification; (6) engaging in high-risk investment practices using plaintiffs' assets without plaintiffs' knowledge or consent; (7) engaging in self-dealing to the detriment of each plaintiff or without the plaintiff's consent; (8) failing to disclose facts concerning Commonwealth and Morales' involvement in the Collybus CDO; (9) putting their own interests ahead of the interests of each plaintiff; (10) misrepresenting the value of assets in each plaintiff's accounts; (11) failing to disclose the actual value of assets in each plaintiff's accounts; (12) repeatedly failing to act in the best interests of each plaintiff; (13) favor some clients and funds over others and engaging in improper cross trades between funds; and (14) engaging in fraudulent activity as more fully alleged herein.

52

**89.**

Like Commonwealth and Morales, Cantor placed its own interest ahead of the Pension Funds.  As previously alleged, Cantor created Collybus so that it could get its own failing MBS off of its books (or at least to stop having to mark it down to where the individual MBS were priced) and so that it could receive compensation in the form of the fees it received as placement agent.  It did so despite the knowledge that the Funds were receiving cash and CDO tranches that were worth substantially less than the value of the assets the Funds put into the CDO.  Cantor further breached its fiduciary duty to the Pension Funds when it knowingly short-changed the Funds in distributing the assets of the CDO.  Like Commonwealth, Cantor failed to disclose any of these material facts to the Funds.  Cantor knew that these actions would injure the investors in these Funds and that the investors were the ultimate intended beneficiaries of the transactions that Cantor recommended and executed on behalf of the Funds.

**90.**

Additionally, Cantor aided and abetted Commonwealth and Morales's breach of fiduciary duty to the plaintiffs and conspired with Commonwealth and Morales to effectuate Commonwealth and Morales' breach of fiduciary duty.  Cantor was aware of the fiduciary relationship that Commonwealth and Morales held with respect to the plaintiffs and other individual and institutional investors.   Cantor knew that Commonwealth was a registered investment advisor whose primary business was to provide investment advice to individuals, businesses, and institutions and which provided investment supervisory services, managed investment advisory accounts or held itself out as providing financial planning to clients such as plaintiffs.  Cantor knew that Morales

was the CEO of Commonwealth Advisors and acted as investment advisor to investors such as plaintiffs.  Cantor also knew the investment objectives of each of the Funds, in which the plaintiffs had invested

**91.**

Cantor knowingly induced or participated in Commonwealth and Morales' breach of fiduciary duty to the plaintiffs.  Specifically, Cantor provided substantial assistance that allowed Commonwealth and Morales to breach their fiduciary duties, among them (1) deviating from the investment objectives of the Funds' investors; (2) making inherently unsuitable investments in violation of its duty of prudence; (3) failing to diversify plaintiffs' investments; (4) failing to disclose this lack of diversification; (5) engaging in high-risk investment practices using plaintiffs' assets without plaintiffs' knowledge or consent; (6) engaging in self-dealing to the detriment of plaintiffs or without plaintiffs' consent; (7) failing to disclose facts concerning Commonwealth and Morales' involvement in the Collybus CDO; (8) putting their own interests ahead of the interests of plaintiffs; (9) misrepresenting the value of assets in plaintiffs' accounts; (10) failing to disclose the actual value of assets in plaintiffs' accounts; (11) failing to act in the best interests of plaintiffs; and (12) engaging in fraudulent activity as more fully alleged herein.

**92.**

A third party who acts with the knowledge that the conduct advocated or assisted constitutes a breach of fiduciary duty is deemed to have knowingly participated in the breach of fiduciary duty.

**93.**

Cantor knowingly participated in Commonwealth and Morales' breach for the following reasons:

(1)     Cantor was aware that Morales was breaching his fiduciary duties to his investors by arranging an additional management income stream at the expense of his clients.  Specifically, Cantor was aware that Morales accepted the subordinate and lowest value tranches of Collybus in part because he wanted and got the lucrative role of Collateral Manager and increased the fees associated with that role as a precondition for investing plaintiffs' funds in the Collybus CDO.  Cantor made money as a result of the completion of this transaction;

(2)     Cantor benefited from the artificially higher valuation of the CDO, as it received higher fees based on the value and was able to carry the A-2 on its books at a value that did not require a sizeable write-down.  But, as discussed below, Cantor also knew that Commonwealth's Funds and investors would not benefit from this inflated pricing because they were receiving the bottom tranches, which meant that defaults would plague the Funds going forward;

(3)     Cantor knew that the CDO transaction would actually disadvantage Commonwealth and Morales' clients, including the plaintiffs, whom it knew were invested in the Funds. Cantor knew that after the transaction, the Funds would have subordinate tranches of a CDO with a much lower likelihood of principal and interest repayment than the MBS that the Funds had owned previously. And those subordinate tranches were

burdened by an additional layer of fees. Plus, the Funds would own subordinated interests in Cantor's own suspect MBS portfolio and the very impaired portfolio contributed by Waterfall;

(4)    Cantor knew Morales was entering into the CDO transaction to avoid telling his investors the real state of affairs regarding the market value of the MBS;

(5)    Cantor misled Morales and the Funds as to the value they were receiving in the CDO transaction. In particular, Cantor provided incorrect data for the intex analyses that were used to develop scenarios for the tranches the Funds purchased. This analysis suggested the C, D and Equity transaction would perform without default under the conditions that were experienced.

(6)    Cantor knew that Morales and Commonwealth had deviated substantially from their investors' investment objectives. It was aware of those objectives from the ADV that was attached to the Collybus Offering Circular. It was aware that the Funds would be concentrated in the lower-rated tranches of a Collybus contrary to the Funds' stated investment objectives. This deviation was even more obvious when Commonwealth purchased the A-2 tranche for each of the Funds, including the equity fund. Cantor was aware that Commonwealth was investing in a manner that was unsuitable for its investors, because all Funds were concentrated in a single CDO with very substantial leverage, an investment strategy that inherently conflicted with the investment objectives described in the ADV.

437637v.6

**94.**

Commonwealth and Morales' breach of fiduciary duties to the plaintiffs would not have been possible without Cantor's willingness to work with Commonwealth to create, structure, and sell the Collybus CDO and, later, to enter the repurchase agreement covering the sale of the A-2 tranche.

**95.**

As more fully alleged herein, Commonwealth, Morales and Cantor caused each plaintiff to incur significant financial losses and sustain other injuries as a direct and foreseeable consequence of their breach of fiduciary duty owed to each plaintiff, aiding and abetting same, substantially participating in same, and conspiracy to commit same and, thus, are liable to each plaintiff for all such losses and injuries.

**96.**

As more fully alleged herein, Cantor caused the Pension Funds to incur significant financial losses and sustain other injuries as a direct and foreseeable consequence of its breach of fiduciary duty owed to the Pension Funds and, thus, is liable to the Pension Funds for all such losses and injuries.

**97.**

Moreover, under La. R.S. 11:264.6, a fiduciary to  Pension Funds is liable not only for actively participating in a breach committed by a co-fiduciary, but also for trying to conceal a co-fiduciary's breach, or failing to take reasonable care to prevent another fiduciary from committing a breach. Any fiduciary who has knowledge of a co-fiduciary's breach has a duty to remedy the breach. Co-fiduciaries found to be liable under this section shall be held jointly liable for breach of fiduciary duty and owe attorney's fees. La. R.S. 11:264.5; La. R.S. 11:264.7.

**98.**

Under Louisiana law, a fiduciary to Pension Funds who has breached its fiduciary obligations shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. In addition, attorney fees are available to the prevailing party.

**99.**

Cantor is liable for Commonwealth and Morales's breach as a co-fiduciary because it participated in the breach by assisting Commonwealth and Morales in the formation of the CDO and the exchange of the Pension Funds' assets for the CDO tranches and cash and, again, when it sold the A-2 tranche to Commonwealth, concentrating and leveraging the Funds' portfolios in contravention of their investment objectives.

**100.**

Cantor is personally liable as a co-fiduciary to the investors for the losses they sustained as a result of the breach of fiduciary duty committed by Commonwealth and Morales.

**SECOND CLAIM FOR RELIEF: NULLITY OF CONTRACT**

**101.**

Under Louisiana law, a contract cannot exist without a lawful "cause," cause being the reason why a party obligates himself. The cause of an obligation is unlawful

437637v.6

when the enforcement of the obligation would produce a result prohibited by law or against public policy.  A contract without a lawful cause is null.  When even one of multiple causes of an obligation is unlawful, the obligation is extinguished.

**102.**

A contract is absolutely null when it violates a rule of public order.  A contract without a lawful cause is absolutely null. A contract that is absolutely null may not be confirmed.  Absolute nullity may be invoked by any person or may be declared by the court on its own initiative.

**103.**

A contract is relatively null when it violates a rule intended for the protection of private parties.  Relative nullity may be invoked by those persons for whose interest the ground for nullity was established.

**104.**

A contract may be declared null when consent is vitiated, such as when error concerns the cause of the contract.  Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation.  Contractual cause may fail due to an error or mistake as to an existing fact at the time of agreement or due to a change in circumstances after the agreement has been entered by the parties. Error as to anything which the parties should in good faith have regarded as a cause of the obligation bears on cause.

437637v.6

**105.**

An absolutely null contract, or a relatively null contract that has been declared null by the court, is deemed never to have existed. The parties must be restored to the situation that existed before the contract was made. If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages. Parties to the contract who are not in good faith are subject to the effects of a declaration of nullity and rescission of contract.

**106.**

The plaintiffs' purchase of the Funds and other related transactions are absolutely null for want of lawful cause and vitiated consent.  Alternatively, the transactions are relatively null for having transpired without plaintiffs' consent concerning the true nature of the Funds and Morales' true purpose in conducting the sales, and insofar as the transactions effectuated numerous breaches of fiduciary duty and other violations of law intended to protect plaintiffs as clients of Commonwealth and Morales.

**107.**

Cantor's sale of, and the Funds' purchases of, all tranches of Collybus, all transactions related to the formation and purchase of Collybus, and all other transactions forming the basis of this suit are absolutely null for want of lawful cause.  Alternatively, the transactions are relatively null for having effectuated numerous breaches of fiduciary duty and other violations of law intended to protect plaintiffs as clients of Commonwealth and Morales.  As fully and specifically alleged in this complaint, Cantor and Commonwealth's reasons for conducting these transactions were in furtherance of Commonwealth and Morales' breach of fiduciary duty and constituted fraud by and

between the parties.  These transactions were also violations of Louisiana securities law and other Louisiana law, as fully alleged herein.

**108.**

Plaintiffs seek to have these transactions declared an absolute nullity or a relative nullity by virtue of their status as clients of Commonwealth and Morales whose interests are intended to be protected by laws which place a fiduciary duty upon Commonwealth, Morales and/or Cantor, as well as laws which are designed to protect plaintiffs against such transactions, such as La. C.C. art. 1953, Titles 11 and 12 of the Louisiana Revised Statues, and Louisiana Blue Sky law.

**109.**

Plaintiffs also seek to have these transactions declared an absolute nullity or a relative nullity insofar as plaintiffs reasonably believed, based on what they were told, that they were investing in fixed income Funds, without substantial leverage, managed by a well-intentioned fiduciary who would implement prudent diversification policies and issue accurate reporting of results, all in accordance with their best interests.  They would not have invested in Funds that invested in a leveraged strategy that put their retirement Funds at considerable risk. This constitutes vitiated consent, including error as to cause under Louisiana law.

**110.**

Due to the investors' error as to the cause, the investors are entitled to rescission of the contract to purchase interests in the Funds under Louisiana law.

**111.**

Cantor was not in good faith with regard to the transactions challenged by the plaintiffs in this suit.  Cantor knew that Commonwealth and Morales were breaching their

437637v.6

fiduciary duties to the plaintiffs by entering into the transactions giving rise to this suit and by having plaintiffs invest in the Funds.  As discussed below, Cantor knew that Commonwealth and Morales were misrepresenting and omitting material facts to plaintiffs as investors and clients of Commonwealth, and Cantor knew that Commonwealth was engaging in fraud.  Moreover, Cantor is alleged to have aided and abetted and conspired with Commonwealth and Cantor in breaching their fiduciary duties and in committing fraud.

### 112.

Insofar as Cantor's sale of, and the Fund's purchases of, all tranches of Collybus, all transactions related to the formation and purchase of Collybus, and all other transactions forming the basis of this suit are null and/or due to the investor's error regarding cause, the investors are entitled to rescission of their contract to purchase interests in the Funds and to demand rescission of the contracts entered into the Funds creating the Collybus CDO and investing in it.  Cantor, Commonwealth, and Morales are required to restore plaintiffs to their *status quo ante, i.e.,* to the position they occupied before their purchase of the Funds.

### THIRD CLAIM FOR RELIEF: FRAUD

### 113.

Under Louisiana law, fraud is defined as a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  La C.C. art. 1953.  Fraud may also result from silence or inaction.

**114.**

Plaintiffs have specifically alleged numerous acts of fraud committed by the defendants in connection with Cantor's sale of, and the Funds' purchases of, all tranches of Collybus, and all transactions related to the formation and purchase of Collybus, and other transactions forming the basis of this suit.  In summary, the defendants deliberately concealed numerous material facts from the plaintiffs.  Cantor, Commonwealth, and Morales failed to disclose they were conspiring to create the Collybus CDO to avoid write-downs or disclosures to investors about their woeful investment performance and to generate possible liquidity for Cantor and fees for Commonwealth, thereby benefiting themselves at the expense of the plaintiffs.  Moreover, they intentionally withheld other material facts, including that the Funds had become highly leveraged in order to buy $260 million  in MBS and that Morales and Cantor conspired together to sell the A-2 tranche in obvious contravention of the Funds' investment objective of diversity in the portfolios.

**115.**

Commonwealth and Morales consistently and knowingly overstated the value of the investors' holdings in the Funds.  Cantor knew that these values were being overstated based on a variety of sources, including the fact that Cantor received copies of the statements containing the inflated valuations.  Based on their ongoing relationship with Commonwealth and Morales and their knowledge of their role in the Collybus transaction, Cantor knew that these statements misstated the true value of the investors' investments.

**116.**

The plaintiffs are entitled to rescission of their contract to purchase interests in the

Funds.  Cantor, Commonwealth, and Morales are required to restore the investors to their *status quo ante, i.e.,* to the position they occupied before their purchase of the Funds because Cantor's sale of, and the Funds' purchases of, all tranches of Collybus, because all transactions related to the formation and purchase of Collybus, and all other transactions forming the basis of this suit were made in furtherance of a fraud between Cantor, Commonwealth, and Morales against Commonwealth and Morales' clients, including plaintiffs.

### FOURTH CLAIM FOR RELIEF: VIOLATIONS OF LOUISIANA AND DELAWARE BLUE SKY LAW, LA. R.S. 51:701 *ET SEQ.*

### 117.

Louisiana Blue Sky Law La. R.S. 51:701 *et seq.,* provides that it is unlawful for any person to offer to sell or to sell a security a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact. To prevail in an action under Louisiana's Blue Sky Law, the plaintiff must show: (1) the defendant made a false or misleading statement of a material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; and (3) the defendant knew, or in the exercise of reasonable diligence, could have known, of the untruth or omission.

### 118.

Commonwealth and Morales concealed numerous material facts from the investors in connection with the plaintiffs' investment in the Funds and the Funds' purchase of Collybus. Defendants failed to disclose they were conspiring to create the CDO to avoid write-downs or disclosures to investors about their woeful investment performance and to generate possible liquidity for Cantor and fees for Commonwealth,

64

thereby benefiting themselves at the expense of the Funds.  Moreover, they omitted various other material facts, including that the Funds had become highly leveraged in order to buy $260 million  in MBS and that Morales and Cantor conspired together to sell the A-2 tranche in obvious contravention of the Funds' investment and diversification objectives.

### 119.

Having sold securities by means of misstatements or omissions of material fact, Commonwealth and Morales are jointly and severally liable to the investors for rescissionary damages.   La. R.S. 51:714 provides that, when a person has violated Section 712(A), the buyer of the security "may sue in any court to recover the consideration paid in cash or, if such consideration was not paid in cash, the fair value thereof at the time such consideration was paid for the security . . . less the amount of any income received thereto."  The buyer is further entitled to (1) interest, (2) all taxable court costs, and (3) reasonable attorney's fees, upon the tender, where practicable, of the security at any time before the entry of judgment.

### FIFTH CLAIM FOR RELIEF: NEGLIGENCE

### 120.

The defendants owed a duty of care to the plaintiffs under the general tort law of the various states involved.  In particular, Morales and Commonwealth owed duties of care based on their direct advisory relationship with the plaintiffs.  Cantor owed a general duty to the investors because the Funds were its clients and the investors were the intended beneficiaries of the Funds' activities.

437637v.6

**121.**

The defendants breached these duties based upon the facts outlined above.  In particular, Morales and Commonwealth breached their duties by failing to invest in accordance with the objectives of the investors and the Funds, by failing to make proper and complete disclosures, and by engaging in activities designed to benefit themselves at the expense of the investors.

**122.**

Cantor breached its duties by participating in activities that it knew were contrary to the reasonable expectations of the investors who Cantor knew to be the intended beneficiaries of the Funds.  Under the general duties arising under state law, a party cannot engage in transactions with an agent for a known principal when the party knows that the transaction is detrimental to the principal and that the agent is undertaking the transaction to benefit himself.

**DAMAGES**

**123.**

Plaintiffs are currently unable to redeem their investments in the CA Funds.  On or about December 31, 2008, Commonwealth unilaterally suspended redemptions in the CA Funds without any warning to plaintiffs and without any formal written notice after the fact.  The suspension of redemptions was not discovered until much later.

**124.**

In addition to all other allegations set forth herein, as direct and foreseeable consequence of the actions of the defendants as alleged herein, plaintiffs have sustained millions of dollars in losses comprised of diminution in the value of their investments,

66

payments made by Commonwealth to Cantor that should have been paid pro rata to plaintiffs, "fees" which have been collected by the defendants in connection with their tortious actions, and monies paid by plaintiffs as a consequence of inflated and/or false valuations of their holdings in the CA Funds. Thus, plaintiffs seek rescissionary damages in the amount of cash paid and the fair value of all consideration given, valued at the time given, by each plaintiff in connection with the sales of the Funds, in connection with the sales of Collybus and any Collybus-related transactions, plus legal interest from the purchase dates until paid, upon or in exchange for the sale or tender of Collybus or its underlying assets to any defendants or any third party, less any income earned by the plaintiffs on the asset, to the extent required by law; all "fees" and other money charged or taken in connection with the defendants' tortious actions, such as the charging and collection of transaction and management fees; damages for the diminution in value of plaintiffs' interests in the Funds caused by the actions of the defendants; all sums paid by plaintiffs as a consequence of inflated and/or false valuations of their holdings in the Funds, the full amount of all other financial losses sustained by the plaintiffs as a consequence of the acts of the defendants; a reasonable sum in exchange for the Funds' holdings in Collybus or any securities or other assets underlying Collybus, which will then be paid pro rata to plaintiffs; as well as all other damages and special relief available to them under the law, all recoverable costs, legal interest from date of sale and/or date of filing until paid; and reasonable attorney's fees. Plaintiffs also, or alternatively, seek a finding that their purchases of the Funds, the 2007 & 2008 Collybus deals, and all related transactions and agreements, including any indemnity agreements, are absolutely null, or alternatively relatively null, thereby returning plaintiffs'

437637v.6

investments in the Funds to the position they were in prior to the transactions, which may include payment of damages by the defendants.

**PRAYER**

WHEREFORE, plaintiffs Joseph N. Broyles, M. Badi Asbahi,  Preston Cloyd, Steve Collins and Eileen Collins, Charles and Anne Richey, Susan B. Beninati, Russ P. Barranco, Janice B. Virgadamo, Jody A. Barranco, Karen L. Barranco, the Municipal Employee's Retirement System of Louisiana, Firefighters Retirement System, and the Registrar of Voters Employee Retirement System pray for a trial by jury; and

Plaintiffs pray that after due proceedings are had, there be judgment in their favor and against Cantor Fitzgerald & Co., Commonwealth Advisors, Inc., Walter A. Morales III, *in solido*, for a declaratory judgment that the Release and Indemnity provisions are unenforceable; rescissionary damages in an amount reasonable in the premises or other damages to which plaintiffs are entitled; legal interest from date of judicial demand until paid; all costs of these proceedings, reasonable attorney fees; and all other general and equitable relief recoverable under the law.

Dated: February 6, 2012

BY ATTORNEYS:

/s/ Patrick N. Broyles
Patrick N. Broyles (TA), La. Bar. Roll No. 29109
**BROYLES LAW FIRM, LLC**
412 N. 4th Street, Suite 230
Baton Rouge, Louisiana 70802
Telephone: (225) 663-2223
Facsimile: (225) 208-1670
Email: broyles@broyleslawfirm.com

437637v.6

AND

/s/ Kirk Reasonover
Kirk Reasonover (TA), La. Bar No. 21061
**REASONOVER AND OLINDE, LLC**
400 Poydras Street, Suite 1980
New Orleans, Louisiana 70130
Telephone: (504) 587-1440
Facsimile: (504) 587-1577
Email: kreasonover@reasonoverolinde.com

AND

/s/ Jim Swanson
James R. Swanson (TA), La. Bar Roll No. 18455
**FISHMAN HAYGOOD PHELPS WALMSLEY WILLIS & SWANSON, L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: jswanson@fishmanhaygood.com

*Attorneys for plaintiffs*

AND

/s/ Steven Stockstill
Steven Stockstill, 19166
3100 Brentwood Drive
Baton Rouge, LA 70809
Telephone:  (225) 925-4060
Facsimile: (225) 925-4062

*Attorney for Firefighters' Retirement System*

437637v.6