UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JOSEPH N. BROYLES, *et al.*

                        CIVIL ACTION

VERSUS

                        NO. 10-864-JJB
                        CONSOLIDATED WITH
                        NO. 10-857-JJB

CANTOR FITZGERALD & CO., *et al.*

## RULING ON DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on motions to dismiss by Defendant Cantor Fitzgerald & Co. ("Cantor") (Doc. 90) and Defendants Commonwealth Advisors, Inc. ("Commonwealth") and Walter Morales ("Morales") (Doc. 91). Plaintiffs Joseph N. Broyles, *et al.*[1] (collectively referred to as "Plaintiffs") filed oppositions (Doc. 96 & 98),[2] to which Cantor filed a reply. (Doc. 103). Commonwealth and Morales did not file a reply. Oral argument is not necessary. For the reasons herein, the Court GRANTS Cantor's Motion to Dismiss (Doc. 90), with the exception of the aiding and abetting a breach of fiduciary duty claim, and the Court DENIES Morales and Commonwealth's Motion to Dismiss. (Doc. 91).

I.

The following facts are from Plaintiffs' Second Amended and Restated Complaint ("SAC") (Doc. 87) and are accepted as true for the purposes of this motion. *See Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012). Commonwealth is a Louisiana corporation and registered investment advisor and Morales is its founder, President, Managing Partner, and Chief

---

[1] Plaintiffs are individuals, Municipal Employee's Retirement System of Louisiana, the Registrar of Voters Employee Retirement System, and the Firefighters' Retirement System. (Doc. 87).
[2] Both Doc. 96 & 98 are identical, although Doc. 96 is in opposition to Commonwealth's Motion (Doc. 91), and Doc. 98 is in opposition to Cantor's Motion (Doc. 90).

Investment Officer. Plaintiffs are individuals and municipal pension funds who invested in one or more of Commonwealth's pooled asset hedge funds. Plaintiffs chose to invest with Morales because they were seeking conservative investment strategies, and Morales held himself out as a conservative investment advisor and a fixed income specialist.

In 2005, Morales formed pooled investment funds ("Funds") designed "to replace the individual managed portfolios." (SAC, ¶ 12). Morales represented to his investors that these Funds would permit the investors to diversify but with minimal risk. *Id.*  Although the Funds were able to borrow money, Morales and Commonwealth indicated that this was not their investment strategy, which Plaintiffs maintain reinforced their beliefs that the Funds were a low-risk investment. Morales's compensation for the Funds was "based on a percentage of assets under management" and he was eligible for an "upside performance bonus based on annual gains[.]" (SAC, ¶ 19). His fees were calculated based on the "value of the assets reported to investors," which Plaintiffs assert incentivized Morales to "keep the reported value of the assets as high as possible." (SAC, ¶ 20). Plaintiffs assert that Morales did not disclose this fee arrangement to them.

Morales invested in and purchased mortgage-backed securities[3] for the Funds, many of which were purchased from Cantor. (SAC, ¶ 22-23). In order to purchase these securities, Morales borrowed money on behalf of the Funds from Cantor and other lenders. The Funds

---

[3] Mortgage-backed securities are a type of debt securities. As the United States Court of Appeals for the Fifth Circuit explained,

> Mortgages are collected into a trust, mortgage payments are sent to that trust, then pooled, and then paid out to the holders of the securities. The quality of the mortgage pool is crucial. If the mortgage pool comprises loans whose borrowers consistently pay in a timely manner, securities holders will receive a steady stream of income. In contrast, if the mortgage pool is "sub-prime," or at risk for missed payments, then securities holders may not receive the forecast income stream. Delinquent mortgages result in smaller payment streams and smaller payments to securities holders.

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 385 (5th Cir. 2010).

borrowed from Cantor were subject to a repurchase agreement, which consists of a seller
(Commonwealth) who sells a security to a buyer (Cantor) for a set price while agreeing to
"repurchase the security at a future date." (SAC, ¶ 24). "In exchange for these securities, the
seller – Commonwealth – receives cash proceeds on which it must pay interest." (*Id.*). If the
price of the security decreases "while the buyer holds the security as collateral, the seller may be
required to provide extra collateral in order to support its margin obligations to the buyer." (*Id.*).
By June of 2007, the majority of the Funds' holdings were mortgage-backed securities.

However, in 2007, many mortgage-backed securities were "downgraded by the ratings
agencies and the market prices of the Funds' [mortgage-backed securities] broadly declined."
(SAC, ¶ 26). In the summer of 2007, the Funds' lenders, including Cantor, no longer wanted to
"extend loans with [the] downgraded [mortgage-backed securities] as collateral[,]" and Cantor
eventually withdrew all of its financing. (SAC, ¶ 27). Although Commonwealth had trouble
meeting margin calls, Morales failed to disclose this to the investors. Additionally, Morales did
not disclose that the values of the mortgage-backed securities had declined because his fee was
based on the reported net asset value. If Morales had reported the lower value, he would have
received less in fees. Moreover, Plaintiffs assert that they would have redeemed their holdings
had they known that they had lost substantial value.

Additionally, Plaintiffs allege that it was industry practice for hedge funds that purchased
and sold mortgage-backed securities to obtain multiple price quotes "from dealers who regularly
traded in similar securities[,]" which would be used to "compile values for the bonds that
determined the  monthly net asset values that were reported to Fund investors." (SAC, ¶ 29).
However, despite indicating that the Funds followed this practice, Morales did not seek multiple

price quotes. Rather, Morales used "inflated, self-generated values to calculate" the value of the Funds, and overstated the value of the mortgage-backed securities in his portfolio. (SAC, ¶ 31).

Because the mortgage-backed securities had declined in value, in summer of 2007, Morales and Cantor discussed forming a collateralized debt obligation ("CDO") to repackage the mortgage-backed securities. CDOS are complex financial structures, which are "secured by pools of asset-backed securities, such as [mortgage-backed securities]." (SAC, ¶ 32). "The income stream that cash-flow CDOs offer to investors is generated by the portfolio of underlying assets and is paid to investors in the order of the seniority of the tranche they hold." (*Id.*). "The risk associated with a CDO investment depends on the seniority of the purchased tranche." (*Id.*). A tranche is a section of a CDO, and the seniority of a CDO issued note's tranche determines the payment priority. An "A" tranche will receive all of the interest due prior to a "B" tranche receiving any of its owed interest. Similarly, the principal of an "A" tranche will be repaid prior to the principal of a "B" tranche, and the principal of a "B" tranche will be paid prior to the principal of a "C" tranche, and so on.

Plaintiffs allege that both Cantor and Morales owned mortgage-backed securities that had sharply declined, and had either reported this decline, both Cantor and Morales would have suffered business losses. However, by converting the mortgage-backed securities into a CDO, Cantor and Morales would not need to report their losses "because they could effectively value the tranches at whatever price they wanted to." (SAC, ¶ 34). Plaintiffs allege that this was a particularly beneficial transaction for Cantor because Cantor "was to receive the highest-rated senior tranches which had the greatest likelihood of paying out." (*Id.*)

Plaintiffs allege that both Cantor and Morales/Commonwealth knew that there was no market for the CDO, and that Cantor's CEO had publically stated that the markets for CDO were

"shut down" prior to the CDO being issued. (SAC, ¶ 35). However, despite this, Morales and Cantor formed the CDO, known as Collybus. Collybus consisted of (1) the mortgage-backed securities belonging to the Funds, Cantor, and Waterfall[4], a third party and (2) cash from Cantor and Waterfall. The Funds contributed approximately $260 million of its mortgaged-backed securities inventory and received: (1) $100 million cash and (2) the C ($35 million), D ($44 million), and E ($51 million) tranches, totaling $230 million. (SAC, ¶ 38). In short, the Funds received $230 million for a $260 million contribution.[5] Cantor contributed $605 million of mortgage-backed securities and $42 million in cash (totaling $647 million) and received: (1) A tranches (A-1, $30 million, A-2, $630,500,000, and A-3, $10,200,000) and (2) the B tranche ($5,750,000), totaling $676,450,000. In short, Cantor received $676,450,000 for a $647,000,000 contribution. (*Id.*).

Cantor used its own software programs to value and price the mortgage-backed securities that were contributed to the CDO and the tranches of the CDO, upon which Commonwealth relied. Plaintiffs allege that there were errors in the data used to produce the values, making the potential scenarios for the C, D, and E tranches appear better. Although Cantor corrected the data files after the transaction, this error was costly for the investors. Plaintiffs assert that if Cantor had provided or used the correct information, "the investors would not have suffered the large losses as the transaction would have been structured and priced differently." (SAC, ¶ 46).

Without delving into the intricacies of CDOs and tranches, when Collybus was created and issued, there was no market for CDOs. Plaintiffs allege that both Cantor and Morales knew

---

[4] Waterfall is not a party to this suit. However, Plaintiffs allege that Cantor demanded that Waterfall contribute its mortgage-backed securities into the CDO, and in exchange, Waterfall received primarily the senior tranches. Plaintiffs assert that the mortgage-backed securities that Waterfall contributed were the "worst performing [mortgage-backed securities] contributed by any of the parties whose assets were used to form the Collybus CDO." (Doc. 87, ¶ 37). Plaintiffs further assert that Cantor and Waterfall had an undisclosed business relationship, which caused Commonwealth's investors to sustain a substantial financial loss.
[5] The C, D, and E tranches were the riskiest and lowest-rated tranches of the CDO.

that they would be unable to sell the tranches at "any price near par value[,] and that the CDO was essentially unmarketable. (SAC, ¶ 47). Plaintiffs further allege that instead of creating the CDO, Morales could have sold the mortgage-backed securities and that if Morales had kept his investors informed about the securities' value, they would have been sold because the investors would have "tried to redeem their investments." (SAC, ¶ 48). If Morales had sold the securities, however, he would have had to report the losses to his investors, which would have impacted his career and would have likely ended the Funds. Additionally, because Morales was paid based on the reported value to the investors, it was in his best interest not to sell the mortgage-backed securities for a loss.

Plaintiffs further allege that in addition to avoiding having to report losses, Morales wanted to create the CDO because he would be "paid a 6 basis point Collateral Manager fee on all of the CDO's assets." (SAC, ¶ 51). Although it is not clear whether Morales took both Fund management fees and the CDO Collateral Manager fees for the assets that he managed for the Funds, the assets that Morales managed as the Collateral Manager were significant. "Even assuming [Morales] did not double-dip on the fees directly based on the assets of the Funds, the Funds' initial investment in the CDO was less than [25%] of the principal amount of the CDO, upon which his Collateral Manager fees were based." (*Id.*). By becoming the Collateral Manager, Morales would manage over $800 million, which would generate an additional $500,000 per year for him in fees. (*Id.*). Plaintiffs allege that Morales negotiated with Cantor for this position and to increase the fee, and threatened to withdraw the Funds' assets from the CDO unless the Collateral Manager fee was increased. In short, Plaintiffs allege that Morales agreed to put the Funds' mortgage-backed securities into the CDO and assume the "most subordinate tranches of the CDO" in exchange for a higher fee for his personal benefit. (*Id.*). Prior to this transaction, the

6

Funds had a diverse portfolio of mortgage-backed securities, including both senior and subordinate securities, with differing degrees of risk. After this transaction, the Funds owned the most subordinate tranches of one CDO, which "substantially increased the investors' Funds' exposure to deterioration . . . and decreased the liquidity of the Funds' holdings." (SAC, ¶ 53).

At the beginning of 2008, the C, D, and E tranches were not performing and the values were sharply declining. By the end of the May 2008, the value of the Core Fixed Fund's Collybus holdings had decreased from $22,259,374 to $9,034,070.80 for the D tranches and $13,494,000.00 to $6,747,000.00 for the C tranches. (SAC, ¶ 59). However, Morales did not disclose this decrease in value and instead, reported false numbers to the investors to conceal the losses. Additionally, Morales would make "interfund adjustments to benefit certain investors," so that certain investors would purchase a worthless security, which would benefit other investors. (SAC, ¶ 61). The majority of transactions were facilitated to hide losses, and Cantor allegedly understood and assisted in this practice.

In June of 2008, Morales decided to invest the remaining $100 million cash that he had received from the CDO in more mortgaged-backed securities. Cantor and Morales agreed that Morales, on behalf of the Funds, would purchase the $610,500,000.000 A-2 tranche for approximately $444 million, using "approximately $300-plus million borrowed pursuant to a repurchase agreement with Cantor." (SAC, ¶ 63). However, this happened "almost immediately after the A-2 tranche was downgraded . . . on May 29, 2008." (*Id.*). Despite telling the investors that Morales would invest using a diversified strategy and "that leverage was not a significant component of the strategies[,]" by July 2008, Morales had "committed the investors' Funds to the A-2 tranche of the CDO." (SAC, ¶64). Cantor allegedly knew that this transaction was not in line with the investors' objectives and assisted with the transactions.

By engaging in the A-2 tranche transaction, Morales was able to report high values to the investors because "when [Morales] reduced the value of those junior tranches . . ., [Morales] offset those losses with substantial purported gains on the A-2 tranche transaction." (SAC, ¶ 67). However, Plaintiffs allege that the figures that Morales used to value the A-2 tranche was "very different [from the way Morales and Cantor had valued the A-2 tranche] and unreasonably optimistic." (SAC, ¶ 68). Although the values were declining significantly, this decline was not reported until the end of 2009 and beginning of 2010.

At the end of 2008, in either November or December, Cantor wanted Morales to "post significant additional capital," but Morales was unable to do so. (SAC, ¶ 71). However, Morales did not inform the investors "that he was concentrated in the A-2 tranche, that he was highly leveraged, that there was a clear and present danger that the Funds' assets could be forcibly liquidated, and that the investors stood to lose most or all of their money." (*Id.*). Morales filed for an arbitration and eventually for an injunction to prevent Cantor from liquidating the A-2 tranche. Morales and Cantor entered into a settlement, indemnifying Cantor and releasing Cantor from liability. (SAC, ¶ 73). Plaintiffs assert that not only were they not informed of this settlement, the release and indemnification were not approved by any disinterested person acting on behalf of the funds. Moreover, Plaintiffs allege that the indemnification and release are unenforceable because Cantor and Commonwealth, "as co-conspirators, cannot release or indemnify each other from liability for their conspiracy." (SAC, ¶ 75).

On October 25, 2011, the Funds filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.

Plaintiffs allege that by forming Collybus, Commonwealth and Morales both breached their fiduciary duties to their investors, and Cantor knew of the fiduciary relationship and of this

breach. Specifically, Plaintiffs allege that Morales's position as Collateral Manager was a conflict of interest and Morales failed to disclose to his investors the transaction, his role as the Collateral Manager, the sharp decline in value of the mortgage-backed securities, or the leverage he was using, and Cantor helped him facilitate the conflict, breach, and concealment. Finally, Plaintiffs allege that Cantor understood the financial objectives of the Funds and Commonwealth's investors.

Plaintiffs have alleged five causes of action against Commonwealth, Morales, and Cantor: (1) breach of fiduciary duty, aiding and abetting the breach, and conspiracy to breach; (2) nullity of contract; (3) fraud; (4) violations of Louisiana and Delaware Blue Sky Law; and (5) negligence. Plaintiffs allege that they are not able to redeem their investments and have "sustained millions of dollars in losses comprised of the diminution in the value of their investments." (SAC, ¶ 124). Plaintiffs seek rescissionary damages equaling the amount of money paid "and the fair value of all consideration given, valued at the time given, by each plaintiff" and "legal interest from the purchase dates until paid, upon or in exchange for the sale or tender of Collybus or its underlying assets . . . less any income earned by the plaintiffs[.]" (*Id.*). Plaintiffs also seek damages "for the diminution in value of plaintiffs' interest in the Funds" and a "reasonable sum in exchange for the Funds' holdings . . . ." (*Id.*). Additionally, Plaintiffs seek a finding that the aforementioned transactions and agreements are null, which will put "plaintiffs' investments in the Funds to the position they were in prior to the transactions[.]" (*Id.*).

II.

Cantor, Commonwealth and Morales have filed motions to dismiss. Cantor filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 12(b)(7), 9(b), 17(a), and 19(b). Cantor raised four (4) principal arguments in support of its motion. First, Cantor

asserts that Plaintiffs lack standing to bring a direct suit against Cantor because (1) the Funds are the real parties in interest and (2) the claims asserted against Cantor are derivative, not direct. (Doc. 90). Second, Cantor argues that the Funds are indispensable parties that cannot be joined, thereby mandating dismissal. Third, Cantor argues that the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1) ("SLUSA") warrants dismissal of a class action "brought under state law that involve[s] alleged fraud in connection with a security covered by the federal securities laws." (*Id.* at 2). While the SAC does not allege a class action, this action was consolidated with a prior action, *Broyles II*, which did allege a class action. Cantor asserts that the SAC is still subject to SLUSA because it is part of a "group of lawsuits filed or pending in the same court and involving common questions of law or fact." 15 U.S.C. § 78bb(f)(5)(B)(II). Fourth and finally, Cantor asserts that the SAC does not assert a claim against Cantor and fails to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which governs the pleading standards for claims based on fraud.

Commonwealth filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19(b), asserting identical arguments raised by Cantor. Commonwealth argues that the SAC should be dismissed because (1) the Funds are indispensable parties that cannot be joined and (2) SLUSA mandates dismissal of the suit.

### III. Standing

Cantor argues that the claims asserted against it are derivative, not direct, and Plaintiffs lack standing to assert direct claims against it. Cantor asserts that the real parties in interest are the Funds and the Funds sustained losses due to their investment in Collybus. In other words, the Funds sustained injury by investing in Collybus, and any injury sustained by the Plaintiffs from this investment was "an indirect injury incurred by virtue of their status as shareholders" in the

Funds. (Doc. 90-1, at 8). Cantor asserts that Plaintiffs are unable to pursue a direct claim against Cantor because any claims against Cantor stem from the Funds' purchase of Collybus notes, and thus, Plaintiffs lack standing.

It is undisputed that the Funds are Delaware limited liability companies and Cayman Islands companies and that Delaware law and Cayman law govern the issue of whether the claims asserted are direct or derivative. *Smith v. Waste Management, Inc.*, 407 F.3d 381, 384 n.1 (5th Cir. 2005). The Delaware Supreme Court in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) explained that when determining the issue of whether a claim is direct or derivative,

> [t]hat issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

*Id.* (emphasis in original). In other words, "a court should look to the nature of the wrong and to whom the relief should go." *Id.* at 1039. "The stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* Additionally, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.*

Cantor argues that Plaintiffs' claim is derivative because Plaintiffs cannot show any injury that is "independent of any alleged injury to the [Funds]." *Id.* Cantor further argues that even if Plaintiffs are trying to "vindicate duties owed to them directly[,] . . . a direct action would not be appropriate because plaintiffs cannot allege any injury independent from that suffered by the Funds." *In re Goldman Sachs Mutual Funds Fee Litigation*, 2006 WL 126772, at *7 (S.D.N.Y. 2006). Cantor asserts that any alleged harm that may have stemmed from its actions

"fell in the first instance on the CA Funds, and affected Plaintiffs indirectly in their capacity as shareholders in the Funds[.]" (Doc. 90-1, at 9). *See Ernst & Young Ltd. v. Quinn*, 2009 WL 3571573, at *8 (D. Conn. 2009) (applying Delaware law) (finding that the claims were derivative because the plaintiffs sought recovery for "damages sustained on account of their investment . . . [and] the injuries all stem from the fact that the Fund suffered a direct injury.").

Cantor further argues that Plaintiffs' claims are derivative, and not direct, because the alleged harm was suffered by all the shareholders in the Funds. "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative[.]" *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008). Even though the "alleged harm is ultimately suffered by . . . the stockholders[,]" this "does not make a claim direct [because a direct claim requires that], the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large." *Id.*

Finally, Cantor asserts that the claims are derivative because any potential recovery from Cantor would benefit the Funds directly, which would indirectly benefit the Plaintiffs. Because Plaintiffs seek a "reasonable sum in exchange for the Funds' holdings in Collybus or any securities or other assets underlying Collybus, which will then be paid pro rata to plaintiffs," (SAC, ¶ 124), Cantor asserts that this is evidence of a derivative claim because the Funds will first receive the sum. *See Ernst & Young*, 2009 WL 3571573, at *9 (finding that because plaintiffs "seek recovery based upon their proportional investment in [the Fund], any recovery would be, in the instance, received by the Fund[,]" plaintiffs' claims under Delaware law were derivative).

In opposition, Plaintiffs assert that the claims asserted against Cantor are direct because Morales and Commonwealth owed duties directly to the Plaintiffs and breached these duties with Cantor's "active assistance." (Doc. 96 at 17). Plaintiffs argue that Cantor's argument is incorrect because Plaintiffs do not need to show a special injury to pursue a claim against Cantor, and that the Delaware Supreme Court rejected this argument in *Tooley*. In *Tooley*, the Delware Supreme Court rejected the notion that "an action cannot be direct if all stockholders are equally affected or unless the stockholder's injury is separate and distinct from that suffered by other stockholders." *Tooley*, 845 A.2d at 1038-39. Rather, the proper focus is whether the stockholder can show "that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* at 1039. Plaintiffs contend that even if all of the shareholders in the Funds suffered an injury, this does not prevent the injury from being direct because the injuries "arise from breaches of specific duties owed directly to them." (Doc. 96 at 18).

The Court agrees that both Plaintiffs and Cantor have stated the correct law. However, the Court does not find that Cantor is arguing that the Plaintiffs have to show that their injury was unique to them in that it has to be a "special injury." Rather, the Court finds that both Cantor and Plaintiffs are stating the same requirement: that the injury must be direct to the Plaintiffs and that the injury must be independent of any injury to the corporation. Thus, the Court is not persuaded by Plaintiffs' argument that Cantor's argument is incorrect.

Plaintiffs further argue that the cases upon which Cantor relies are factually distinct because the plaintiffs in those cases were "mere shareholders" and did not "allege that the defendants breached specific duties owed to them." (Doc. 96 at 18). Finally, Plaintiffs argue that Cantor's argument that any recovery that Plaintiffs would receive would belong the Funds, and

not to the Plaintiffs directly, is incorrect. Plaintiffs assert that this argument was raised by the Funds in their bankruptcy proceeding and that the bankruptcy court rejected this argument. However, Cantor points out that this is not entirely accurate and bankruptcy court concluded that "[i]n denying summary judgment, the Court finds only that the Debtors have not carried their burden to show that the *Broyles I* claims are *entirely* derivative. The court does not reach whether those claims are, in part or in full, direct claims." (Plaintiffs' Ex. D, at ¶ 12). Cantor argues that this interlocutory ruling has no bearing on Cantor's present motion because Cantor is not arguing that all of the claims in the Amended Complaint are derivative. (Doc. 103). Instead, Cantor is arguing that the claims as to Cantor, which involve the Funds' purchase of Collybus notes and subsequent injury to the Funds, are derivative. (*Id.* at 4). The Court agrees and will not consider the bankruptcy opinion.

Turning to Plaintiffs' specific claims, Cantor asserts that (1) the "holder" claims are derivative; (2) the mismanagement claims are derivative; (3) any direct claims that Plaintiffs may have are against Commonwealth and Morales; and (4) the claims belong the Funds' bankruptcy estate. The Court will address each argument in turn.

*Holder Claims against Cantor*

Cantor argues that Plaintiffs' claims that they held their shares in the Funds based on alleged misrepresentation by Morales, that Cantor allegedly knew of this misrepresentation and assisted Morales do not rise to a direct claim against Cantor. Cantor points to *Smith v. Waste Management*, 407 F.3d 381 (5th Cir. 2005) for the proposition that "holder" claims are derivative and not direct. In *Smith*, the Fifth Circuit found that that "misrepresentations that allegedly caused [plaintiff's] losses injured not just [plaintiff] but the corporation as a whole." *Smith v. Waste Management*, 407 F.3d 381, 384-85(5th Cir. 2005). "[W]hen a corporation, through its

officers, misstates its financial condition, thereby causing a decline in the company's share price when the truth is revealed, the corporation itself has been injured." *Id.* at 385. Because "the misconduct alleged by [plaintiff] did not injure [plaintiff] or any other shareholders directly, but instead only injured them indirectly as a result of their ownership of [company] shares . . . [plaintiff] cannot prove his injury without also simultaneously proving an injury to the corporation[,]" which rendered plaintiff's claims derivative. *Id.*

Cantor asserts that any alleged misrepresentations made by Morales and/or Commonwealth transpired when Plaintiffs were shareholders in the Funds, and thus, their "holder" claims against Cantor are derivative. Cantor argues that Plaintiffs are unable to prevail on this claim without showing some injury to the Funds – that is that the Funds decreased in value due to the alleged misrepresentation – which Cantor asserts is inherently a derivative claim.

In opposition, Plaintiffs argue that had they been aware of the true financial state of the Funds', they would have sold, thereby mitigating the amount of losses they sustained. Plaintiffs contend that because Morales misrepresented the net asset value, Morales, Commonwealth, and Cantor "induced Plaintiffs to 'hold' their investments." (Doc. 96 at 25). Plaintiffs object to Cantor's reliance on *Smith*, asserting that unlike the Plaintiffs here, the plaintiff in *Smith* did not have a "direct fiduciary relationship with any of the defendants." (*Id.* at 26). However, as Cantor points out, the Fifth Circuit found that the claim was derivative not because there was a lack of a direct fiduciary relationship but because the plaintiff was unable to "prove his injury without also simultaneously proving an injury to the corporation." *Smith*, 407 F.3d at 385.

However, Plaintiffs assert that the holding in *Smith* did not establish a bright-line rule that "holder" claims are always derivative. Plaintiffs point to *Albert v. Alex. Brown Management*

15

*Services, Inc.*, 2005 WL 2130607, at *9 (Del. Ch. 2005) in which the Delaware Chancery Court found that the managers "failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements" and that "[g]enerally, non-disclosure claims are direct claims." *Id. See also In re Parkcentral Global Litigation*, 2010 WL 3119403 (N.D. Tex. 2010) (applying *Albert); Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 401 n.9 (S.D.N.Y. 2010) (finding that under both New York and Delaware law, non-disclosure was a breach of duty owed independent to the plaintiffs and that such a claim was direct).

In reply, Cantor points out that the Chancery Court in *Albert* explained that the "partnerships were not harmed by the alleged disclosure violations[]" and "[a]ny harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds . . . or to bring suit to force the Managers to redeem their interests." *Id.* Cantor asserts that here, Plaintiffs have alleged that the Funds were harmed. Moreover, Cantor argues that *Smith* is binding upon this Court and that this Court should disregard *Parkcentral* and *Anwar* as being in conflict with the controlling *Smith* decision. Additionally, Cantor points to a recent Second Circuit opinion, in which the court found that the "holder" claim was derivative applying Delaware law. *See Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012).  In *Stephenson*, the plaintiff invested in Greenwich Sentry, LP that was a "feeder fund" into Bernard L. Madoff Investment Securities, LLC, which was later discovered to be a Ponzi scheme. Prior to the plaintiff's investment, Pricewaterhouse (PWC) issued "unqualified audit reports attesting to the accuracy of Greenwich Sentry's financial statements." 482 F. App'x at 620. The Second Circuit affirmed the lower court's decision that the plaintiff had standing to bring a claim against PWC for negligently inducing him to invest in Greenwich, but not "to assert a claim based on his decision to remain invested[.]" *Id.* at 621. While the inducement claim "arose from his alleged

reliance, as an individual investor, on PWC's unqualified audits[,]" the plaintiff could not "prevail [on his holding claim] without showing injury to the [partnership as a whole]." *Id.* (internal citations omitted). Cantor asserts that this Court should follow the binding precedent in *Smith* and the Second Circuit's logic in *Stephenson*, and find that the holder claims are derivative because the Plaintiffs are unable to show an injury without showing an injury to the Funds.

The Court agrees with Cantor. Plaintiffs were injured because of their ownership of share in the Funds, and Plaintiffs "cannot prove [their] injury without also simultaneously proving an injury to the [Funds]." Smith, 407 at 385. Thus, the holder claims are derivative and the Plaintiffs do not have standing to assert these claims.

*Mismanagement Claims*

Cantor argues that any claims that Plaintiffs have against Cantor due to an alleged mismanagement of their investments by Morales and/or Commonwealth and any alleged aiding and abetting on Cantor's part is also derivative. Cantor points out that Plaintiffs purchased shares in the Funds, which in turn, purchased shares in Collybus, but that Plaintiffs never directly purchased shares in Collybus. Because the Funds are corporate entities, any mismanagement claims are derivative. *See Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348, 353 (Del. 1988) (explaining that mismanagement claims "represent[] a direct wrong to the corporation that is indirectly experienced by all shareholders[,]" and that these claims are "entirely derivative in nature."). *See also Hartsel v. Vanguard Group, Inc.*, 2001 WL 2421003, at *17 (Del. Ch. 2011) (explaining that "[u]nder Delaware law, allegations of trustee or director mismanagement regarding securities portfolio investments generally are considered derivative in nature."). Cantor asserts that Plaintiffs have no direct claim against it based on any alleged mismanagement of the

Funds because Plaintiffs would have to show an injury to the Funds first to prove that the mismanagement harmed the Funds.

In opposition, Plaintiffs argue that the mismanagement claims are direct because Morales and Commonwealth owed a duty to them and because Cantor aided and abetted Morales and Commonwealth, Cantor also is liable for this mismanagement. Plaintiffs further argue that they are not seeking damages recovery for mismanagement of the Funds, but instead, recovery for the mismanagement of their personal investment accounts.

However, as Cantor points out, Plaintiffs have not asserted any claim against Cantor concerning their personal investment accounts. Rather, the only involvement that Cantor allegedly had was connected with the Funds, which were corporate entities, not personal accounts. The Amended Complaint alleges that Cantor's involvement with the Funds related to the Funds' purchase and ownership of Collybus notes. Therefore, in light of Delaware law that mismanagement claims are derivative and in light of the fact that Cantor's involvement was with the Funds and a CDO, not personal investment accounts, the Court finds that the Plaintiffs have no direct claim against Cantor for any mismanagement.

*Direct Claims against Morales and Commonwealth*

Cantor argues that any direct claims that Plaintiffs may have should be asserted against Morales and Commonwealth. Any investment in the Funds was due to the representations made by Morales and Commonwealth, but not Cantor. Cantor contends that the damages that Plaintiffs seek, rescinding their investment in the Funds, "lie against the investment advisors who sold them those funds[.]" (Doc. 90, at 15).  Because Morales and Commonwealth did not raise any arguments about whether these claims as applied to them were direct, the Court will not address this.

18

*Plaintiffs' Claims Belong to the Funds' Bankruptcy Estate*

Cantor argues that because the claims asserted by Plaintiffs are derivative, these claims belong to the Funds' bankruptcy estate. The claims Cantor argues belong to the bankruptcy estate are (1) fraud; (2) rescission; (3) fiduciary duty; and (4) negligence.

Fraud

Cantor argues that any harm allegedly sustained from the Collybus transactions was sustained by the Funds directly, and the Plaintiffs were indirectly harmed as shareholders. Plaintiffs assert that they are seeking recovery from Cantor directly because of Cantor's participation in "assisting Morales and Commonwealth in deceiving Plaintiffs with respect to the nature and value of their investments." (Doc. 96 at 22). However, Cantor asserts that the "investments" were not Plaintiffs' personal investments, but the "investments" were actually the Funds, in which Plaintiffs were shareholders.

The Court agrees with Cantor to the extent that any fraud claims asserted against Cantor are derivative in nature. Plaintiffs cite an opinion that applies New York law in support of their position, in which the Southern District of New York found that "the principal wrong here appears to have been a valuation fraud that injured plaintiffs, not the Funds." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005). In *Beacon Hill*, the defendants "fraudulently overstated the [net asset values] of the Funds so as to conceal declines in the value of fund assets and that plaintiffs were injured when they invested or retained their investments in reliance upon the misstatements." *Id.* However, as to Cantor, this is inapposite because Plaintiffs' allegations of fraud as to Cantor do not state that Cantor overstated

19

the net asset values. Rather, Plaintiffs' allegations of fraud as to Cantor primarily are associated with Cantor's involvement in Collybus and the Funds' purchase of shares in Collybus. Thus, the fraud claim is derivative and belongs to the Funds' estate.

<u>Rescission</u>

Cantor asserts that the rescission claim also properly belongs to the Funds' bankruptcy estate. Plaintiffs allege that "Cantor's sale of, and the Funds' purchases of, all tranches of Collybus, all transactions related to the formation and purchase of Collybus, and all other transactions forming the basis of this suit are absolutely null for want of lawful cause." (SAC, ¶ 107). Cantor argues that any rescission of a contract to purchase Collybus would first benefit the Funds and the Plaintiffs would benefit indirectly on a pro rata basis. Plaintiffs argue that because Commonwealth and Morales fraudulently induced them to purchase holdings in the Funds, "their individual purchase contracts are null." (Doc. 96 at 24). Plaintiffs assert that they were directly harmed by this fraud and they, and not the Funds, will directly receive the benefit of rescissionary damages. Plaintiffs argue that Cantor misunderstands what Plaintiffs are seeking, and that Plaintiffs are attempting to obtain these damages to restore their personal investments, which would benefit them, and not the Funds. Regardless, Plaintiffs argue that if this Court grants leave to amend, Plaintiffs would omit this claim.

However, as Cantor points out, the SAC does not seek rescissionary damages, but rescission of the contract to purchase Collybus, which would benefit the Funds, not the Plaintiffs. Thus, the Court agrees with Cantor that this is a derivative claim, and not a direct claim asserted against Cantor.

<u>Fiduciary Duty</u>

Cantor argues that the breach of fiduciary duty claim belongs to the Funds' bankruptcy estate because it is based on Cantor's involvement in the Collybus transactions and the Funds' purchase of Collybus notes. Cantor asserts that because Plaintiffs never had contact with Cantor and did not purchase anything from Cantor, Cantor does not owe a fiduciary duty to the Plaintiffs. Cantor also asserts that a claim for aiding and abetting a breach of fiduciary duty is not cognizable under Louisiana law because Plaintiffs have not adequately alleged a conspiracy. *See Guidry v. Bank of LaPlace*, 94-1758 (La. App. 4 Cir. 9/15/95); 661 So.2d 1052, 1057 ("In the absence of a conspiracy, there is no distinct cause of action for aiding and abetting under Louisiana law.").

Under Louisiana's conspiracy statute, "[h]e who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person, for the damage caused by such act." La. Civ. Code. art. 2324(A). "[U]nder Louisiana law, a breach of fiduciary duty only arises in contract . . .[and a] cause of action for conspiracy to breach a fiduciary duty lacks an essential element – an underlying intentional tort and must fail." *Louisiana v. Guidry*, 489 F.3d 692, 707 (5th Cir. 2007) (quotations omitted). As this Court has explained, Louisiana law "regarding liability for conspiracies is limited to conspiracies involving tortious conduct and does not extend to alleged breaches of fiduciary duty." *Matthews v. Bancorpsouth Bank*, 2010 WL 797790, at * 8 (M.D. La. 2010).

In opposition, Plaintiffs argue that their claim is alleged under Louisiana, Delaware, and New York law, and while Louisiana law does not permit this claim, Delaware and New York law does. Plaintiffs also assert that it is unnecessary to allege a "direct relationship with Cantor to allege a direct claim against Cantor for breach of fiduciary duty." (Doc. 96 at 21). Plaintiffs

argue that because Commonwealth and Morales owed them a fiduciary duty, Cantor also is liable because Cantor assisted Commonwealth and Morales in breaching their duty.

The Court is inclined to agree with the Plaintiffs if the Court is to apply Delaware or New York law. Cantor has not argued that Morales and Commonwealth did not owe a fiduciary duty to the Plaintiffs, and it appears that, based on the face of the complaint, Morales and Commonwealth did owe a fiduciary duty and that this duty was breached. Under Delaware law, a plaintiff must plead the following elements to state a claim for aiding and abetting: "(i) the existence of a fiduciary relationship, (ii) a breach of that relationship, (iii) knowing participation in the breach by a defendant who is not a fiduciary, and (iv) damages proximately caused by the breach." *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. 2002). The elements for aiding and abetting are the same under New York law. *See Kaufman v. Cohen*, 307 A.D.2d 113, 114, 760 N.Y.S.2d 157 (2003) ("A claim for aiding and abetting a breach of fiduciary duty requires a breach by a fiduciary of obligations to another, that the defendant knowingly induced or participated in the breach, and that plaintiff suffered damage as a result of the breach.")

Here, the Plaintiffs have clearly alleged that there was a fiduciary relationship between Morales, Commonwealth and the Plaintiffs, there was a breach of that relationship, and there were damages caused by that breach. The issue turns on whether Cantor knowingly participated in the breach.

The Court finds that the Plaintiffs have alleged sufficient facts to show that Cantor knew that Morales and Commonwealth were breaching their fiduciary duties and knowingly participated. The SAC alleges that Morales obtained a Collateral Manager fee and "actively bargained with Cantor to increase this Collateral Manager fee," threatening to "pull the Funds' assets out of the CDO unless the fee to him was increased." (SAC, ¶ 51). As alleged in the SAC,

this was a conflict of interest and Cantor knew of this conflict, and participated anyway. Thus, the Court finds that Plaintiffs have alleged sufficient facts to sustain a claim against Cantor for aiding and abetting under New York and Delaware law. However, the Court also recognizes that under Louisiana law, this is not a cognizable claim. Although the Plaintiffs argue that their claim is brought under Louisiana, Delaware, and New York law, neither Cantor nor Plaintiffs have directed this Court to which law is to govern this claim via a conflicts of law analysis. The parties have also not directed this Court as to whether multiple state laws can govern this action. Thus, the Court will deny Cantor's motion to dismiss as to this element.

<u>Negligence</u>

Finally, Cantor argues that any generalized negligence claim asserted against Cantor also belongs to the Funds because the damages sought are based on harm suffered by the Funds due to the Funds' investment in Collybus. The Court is inclined to agree with Cantor and finds that these claims are derivative, and not direct.

In sum, the Court finds that the claims asserted against Cantor are derivative, and not direct, with the exception of aiding and abetting Morales and Commonwealth in their breach of fiduciary duty. Thus, the Court will dismiss the remaining claims as to Cantor.

IV. SLUSA

Defendants[6] assert that SLUSA mandates dismissal of the SAC.

> SLUSA preempts a securities class action if four conditions are satisfied: (1) the action is a "covered class action;" (2) the claims are based on state law; (3) the action involves one or more "covered securities;" and (4) the claims allege a misrepresentation or omission of material fact "in connection with the purchase or sale" of the security.

---

[6] Because Commonwealth/Morales had identical arguments, Commonwealth/Morales adopted Cantor's arguments and provided a brief summary of their arguments to avoid repetition. The Court will refer to Cantor's brief.

*In re Enron Corp. Securities*, 535 F.3d 325, 338-39 (5th Cir. 2008). "Once it is established that SLUSA governs the suit . . . the suit must be dismissed." *G.F. Thomas Investments, L.P. v. Cleco Corp.*, 317 F.Supp. 2d 673, 685 (W.D. La. 2004). It is undisputed that the last three requirements are met. The only dispute is whether this is a covered class action.

Defendants argue that this suit is a covered class action, which includes

> any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which – (I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B)(ii). Defendants argue that because this action was consolidated with *Broyles II*, which Defendants contend was both a class and derivative action, involving the "common questions of law or fact," the present action is a covered class action. The *Broyles II* complaint alleges that it may be "certified as a class action under La. C.C.P. art. 613 . .." (Doc. 90, Ex. 1, ¶ 16).[7] Additionally, the complaint alleges that "this action may be properly maintained as a class action pursuant to the provisions of La. C.C.P. art. 591 and 611 *et seq.*" (*Id.*, ¶ 35). Although La. C.C.P. art 613 is a procedural provision that permits derivative suits to be classified as class actions, Defendants argue that the complaint is also pled as a class action pursuant to La. C.C.P. art. 591, which is the general class action statute. Moreover, Defendants assert that Plaintiffs alleged the requirements to maintain a class action pursuant to La. C.C.P. art 591. (*Id.*, ¶¶ 26-35). Additionally, the complaint alleges that "the number of Class members is believed to be around 100, and potentially less than 100." (*Id.*, ¶ 16).

Plaintiffs argue that *Broyles II* is solely a derivative action. Although *Broyles II* alleges class action claims, Plaintiffs argue that this was to satisfy Louisiana procedural requirements

---

[7] The complaint is also located in 10-cv-857, Doc. 1.

only. La. C.C.P. art. 611 provides that "[a] derivative action may be maintained as a class action when the persons constituting the class are so numerous as to make it impracticable for all of them to join or be joined as parties." La. C.C.P. art. 611. Plaintiffs argue that because a state procedural rule is "meaningless in federal court," the class allegations in *Broyles II* are "entirely gratuitous." (Doc. 96 at 32). Regardless of the state procedural laws, Plaintiffs assert that *Broyles II* is a derivative action because it seeks to "vindicate the rights of the [Funds] only." (*Id.*). The damages sought in *Broyles II* would be awarded to the Funds, and not "on behalf of more than 50 persons." 15 U.S.C. § 78bb(f)(5)(B)(ii). Finally, Plaintiffs argue that under SLUSA, a "the term 'covered class action' does not include an exclusively derivative action brought by one or more shareholders on behalf of a corporation. 15 U.S.C. § 77p(f)(B).

Defendants assert that *Broyles II* still "expressly alleges a class action." (Doc. 103 at 19). Additionally, Defendants argue that the *Broyles II* plaintiffs did not amend the complaint to eliminate the class action allegations after it was removed to federal court towards the end of 2010, nor did they amend after Cantor moved to dismiss *Broyles II* under SLUSA in January 2011.[8] Because the Funds did not file for bankruptcy until October of 2011, Defendants argue that the Plaintiffs had nearly a year before the automatic stay went into effect to amend their complaint so that it was not a class action.

The Court is not persuaded by the Defendants' arguments. A covered class action under SLUSA involves "damages . . . sought on behalf of more than 50 persons[.]" 15 U.S.C. § 78bb(f)(5)(B)(ii). *Broyles II* sought damages on behalf of the Funds, not on behalf of the individual plaintiffs. Thus, *Broyles II* is not a covered class action, and SLUSA does not apply.

V. The Funds as an Indispensable Party

---

[8] *Broyles II*, 10-cv-857, Doc. 13. This motion was terminated per Doc. 22.

Defendants[9] argue that the SAC should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19(b) for failure to join the Funds, necessary parties that cannot be joined. Rule 19(a) provides that a person must be joined if "(A) in that person's absence, the court cannot accord complete relief among existing parties" or "(B) that person claims an interest relating to the subject of the action and is so situated that disposing the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest" or "(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). If such a person cannot be joined, the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

Defendants argue that the Funds are indispensable parties that cannot be joined because the Funds are currently in bankruptcy. Because the Funds are "parties to the agreements in which Plaintiffs purchased shares in the [Funds]" and "to the agreements Plaintiffs seek to rescind in which the [Funds] purchased the Collybus notes," they have a "substantial interest in all of these agreements." (Doc. 90 at 22-23). Any decision on Plaintiffs' rescission claim would not be binding on the Funds, and thus, there would be inconsistent obligations. Additionally, because the Funds have already asserted identical claims in *Broyles II*, the Funds have an interest in this pending matter.

Defendants assert that the four factor test set out in Rule 19(b) mandates dismissal of all the claims, not just the rescission claim. Under 19(b), a court must consider in deciding whether to dismiss the action:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

---

[9] Commonwealth/Morales adopted Cantor's arguments and provided a summary. The Court refers to Cantor's brief.

(2) the extent to which any prejudice could be lessened or avoided by:

    (A) protective provisions in the judgment;

    (B) shaping the relief; or

    (C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). Defendants argue that the Funds are pursuing the same claims in *Broyles II*, and thus, "the similarity of lawsuits is important where similarity affects the interests implicated by Rule 19." *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1313 (5th Cir. 1986). Defendants assert that failing to join the Funds in this action would impair the Funds' ability to pursue the identical claims in *Broyles II*, and prejudice the Defendants.

Defendants also argue that a judgment rendered in the Funds' absence would be inadequate and there is a significant possibility that there would be inconsistent results between *Broyles I* and *Broyles II*. Finally, Defendants assert that there is another forum available if this action is dismissed because the Funds' interests will be pursued in *Broyles II*.

In opposition, Plaintiffs argue that the *Broyles I* complaint is seeking rescissionary damages to restore their personal accounts to their pre-investment position, and a judgment requiring the Defendants to compensate the Plaintiffs for direct injuries would not affect the Funds. Plaintiffs also argue that they intend to amend their complaint to omit their nullity of contract claim, which would moot the issue as to whether the Funds are indispensable parties. In reply, Defendants argue that the nullity of contract claim is immaterial because the Funds are still indispensable parties because it is undeniable that the Funds have an "interest relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B).

The Court finds that with respect to Cantor, it is not necessary to determine whether the Funds are indispensable parties because the Court has dismissed all the claims as to Cantor, with the exception of aiding and abetting a breach of fiduciary duty. With respect to Morales and Commonwealth, the Court finds that the Funds are not indispensable parties because the claims asserted against them are direct, and not derivative. Plaintiffs are suing Morales and Commonwealth for the alleged breach of fiduciary duty owed to the Plaintiffs. These claims may proceed in the absence of the Funds.

VI.

Accordingly, Cantor's Motion to Dismiss is GRANTED (Doc. 90), with the exception of the aiding and abetting a breach of fiduciary duty claim. Morales and Commonwealth's Motion to Dismiss is DENIED. (Doc. 91).

Signed in Baton Rouge, Louisiana on April 17, 2013.

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**